HARTOG MEIBERGEN v. JAMES E. SMITH, *as Sheriff of Russell County.*

INSTRUCTIONS — *Verbiage and Repetitions.* When the instructions of the trial court embody the law applicable to the facts, although stated with much verbiage and with frequent repetitions, there is no cause for reversal.

*Error from Russell District Court.*

THE opinion states the case.

*Robinson & Lawrence,* for plaintiff in error.
*Hays & Pitts,* for defendant in error.

Opinion by SIMPSON, C.: The material facts are, that one M. A. Neff was a merchant possessing a stock of merchandise at Lucas, Russell county, Kansas; that on the 21st day of January, 1888, the defendant in error, as sheriff of that county, levied upon and took possession of such stock of goods by virtue of several writs of attachment against Neff. The plaintiff in error at once replevied the goods, claiming that he had purchased the same in good faith and for a valuable consideration, before the levy of the attachments. His claim is, that one J. W. Huff, president of the Bank of Downs, had a chattel mortgage for $2,400, that was the first lien on said goods; that Huff had taken possession of the goods under and by virtue of the terms of his chattel mortgage, and that he had purchased from Huff. Neff was indebted to various non-resident wholesale merchants in a large

sum. The value of the stock of merchandise when Huff took possession was about $3,000. At the April term, 1888, the case was tried by a jury, and answers to special interrogatories and a verdict returned as follows:

## "FINDINGS OF FACT.

"Q. 1. Did the plaintiff Meibergen, at the date of the purchase of the stock of goods in question, know of any indebtedness of M. ·A. Neff, to either Schuster, Hingston & Co., R. L. McDonald & Co., Donald Bros., Kirkendall, Jones & Co., Julius Kuhn, or Englehart, Winning & Co.? A. Yes.

"Q. 2. If question No. 1 is answered in the affirmative, state to which of the above-named parties said Meibergen knew said M. A. Neff was indebted at the time of his said purchase? A. Julius Kuhn.

"Q. 3. What was the actual value of the said stock of goods in question at the time plaintiff Meibergen bought the same of Huff—$3,000? · A. $3,000.

"Q. 4. Did Neff transfer the goods to Huff for the purpose of hindering, delaying, or defrauding his creditors? A. Yes.

"Q. 5. Did Meibergen, when he purchased said goods, know of the fraudulent intent of Neff? A. Yes.

"Q. 6. Were the facts and circumstances surrounding Meibergen, when he purchased said goods, sufficient to put a reasonably prudent man upon inquiry as to Neff's fraudulent intent? A. Yes.

"Q. 7. Did Meibergen, at the time he purchased these goods, know whether Neff was in debt to anybody except small debts in town? A. Yes.

"Q. 8. Did Meibergen, when he purchased these goods, know of sufficient facts and circumstances to put a reasonably prudent man upon inquiry as to whether Neff was in debt to any person except small debts in town? A. Yes."

The jury found that, at the commencement of the action, the defendant was entitled to the possession of the goods in controversy, that the actual value thereof was $3,000, and that the value of the special ownership by the defendant therein was $2,269.39. A motion for a new trial was made and overruled, and judgment rendered according to the verdict. The case has been brought here for review. Two principal questions are discussed by counsel for the plaintiff in error.

I. The first is that the special findings of the jury are not supported by the evidence. The stock of merchandise, which is the subject-matter of this litigation, had been owned by Neff for some months at Lucas, but before that time he had been located at Delhi, and prior to his residence at Delhi he had lived at Downs, where J. W. Huff and the plaintiff in error reside, and where the bank of which Huff is president is located. Huff claims that he loaned Neff money to the amount of $2,800, between October 1, 1887, and December 8, 1887. The only written evidence about this indebtedness is a chattel mortgage given by Neff to Huff on the 15th of January, 1888. This mortgage recites that it was given to secure one note dated October 10, 1887, for $300, one note dated November 2, 1887, for $300, one note dated November 15, 1887, for $1,000, one note dated November 28, 1887, for $500, and one note dated December 8, 1887, for $700. Huff claims that he never loaned Neff any money until after Neff moved to Lucas; that he loaned the money on the personal note of Neff, and did not take or demand security. Huff also swore that all these loans were made to Neff at Downs, and that on each of these occasions he paid Neff in currency, did not check it out of the bank, and there is no check or record in the bank, or in his private books or papers, showing these payments to Neff. A witness testified that he had a talk with Huff at Downs, on or about the 15th day of December, in which he asked Huff about the financial standing of Neff; was told by Huff that he knew nothing about it, as Neff did his business at the other bank, meaning the First National Bank of Downs. This was after Huff had loaned Neff money, as he claims.

Huff and the plaintiff in error went to Lucas on the 17th day of December, stayed with Neff all day, and told the landlord of the hotel at which they stopped that they were traveling salesmen from Chicago. On January 13, Huff went to Lucas, and after being there a day or two telegraphed to plaintiff in error to come. Meibergen went to Lucas, and was informed that Huff was taking a chattel mortgage, and he wanted the plaintiff in error to help invoice the goods, he be-

ing a merchant of large experience, while Huff had no knowledge of such goods.  The invoice was completed, a chattel mortgage executed by Neff to Huff, that is witnessed by plaintiff in error, and then Huff took possession and sold at a loss of several hundred dollars to plaintiff in error, who sent for his son and put him in charge.  There is some evidence tending to show that at the time Huff claims to have loaned Neff money at Downs, Neff was not away from home, and that at one of the dates fixed by Huff, at which he had personally delivered the money to Neff at Downs, he (Huff) was absent attending court at Mankato.  There is some direct and much circumstantial evidence tending to show that the plaintiff in error knew that Neff had many creditors, was practically insolvent, and unable to pay his debts at the time he purchased the stock of goods from Huff.  Indeed, there is abundant evidence tending to sustain the special finding of the jury, and to support the general verdict.  Of course, it is largely circumstantial, as the common experience of the profession is, that direct proof of commercial fraud is hardly ever produced either before a court or a jury.  Huff's dealing with Neff was not conducted with ordinary business prudence. His loans to Neff of large sums of money, the loans following each other so speedily, without security or a demand for security, is not in accordance with business methods.  No explanation is offered as to how the proceeds of the loan were disposed of.  The knowledge of the loans is confined to Huff alone, so far as the record discloses.  He claimed to have been making these loans on individual account, and carried about his person large sums of money with which to accommodate Neff whenever he called upon him.  These, probably, are some of the many considerations that controlled the verdict of the jury and operated on the mind of the court, and they appear to us such strong and natural inferences from the special acts and general conduct of the parties, that we deem these and other established facts sufficient to sustain both the special findings and the general verdict.

II. The next cause for reversal urged is, that the trial court erred in giving to the jury the following instruction, No. 13:

"That if you find from the evidence that Neff sold or pretended to sell the goods in question to J. W. Huff on a pretended or fictitious indebtedness, and that the same was done for the purpose of hindering, delaying or defrauding Neff's creditors, and that Meibergen knew of such fraudulent intent, and bought with such knowledge, or if you should find from the evidence and surrounding circumstances that Meibergen was in a situation that a reasonably prudent man should or would have known of such fraudulent intent, then Meibergen cannot recover in this action. Meibergen could not blind his eyes to the facts and circumstances which surrounded him, and protect himself by the claim that he had no actual or express knowledge of such fraudulent intent. If facts and circumstances came to the knowledge of Meibergen as should have excited the suspicions of and put a prudent man upon inquiry, and that such inquiry would have led to a discovery of the fraudulent intent of Neff in selling said goods to Huff, the law holds Meibergen to be possessed of all such knowledge in respect to such transaction or fraudulent intent as such inquiry might have developed. And if you find from the evidence that Meibergen bought the goods at a price much less than their actual value, then it is for you to say whether or not this fact, together with the other circumstances which came to the knowledge of Meibergen, as shown by the evidence, were not sufficient to arouse the suspicions of a reasonably prudent man in his situation, and put him upon inquiry as to why Neff and Huff were selling said goods at a sacrifice."

While this instruction is somewhat verbose, and frequent repetitions of the same principle are indulged in, still, stripped of its verbiage, it contains the essence of the law applicable to the state of facts presented by the record. We cannot reverse this case for the errors suggested and urged. We are disposed to think that justice has been done, and that there has been no such serious departure from established rules as compels a new trial.

We recommend that the judgment be affirmed.

By the Court: It is so ordered.

All the Justices concurring.