IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,301

In the Matter of the Parentage of M.F.,
By and Through K.L.,
*Appellant*,

and

T.F.,
*Appellee*.

SYLLABUS BY THE COURT

1.

The same-sex partner of a woman who conceives through artificial insemination may establish a legal fiction of biological parentage by asserting the Kansas Parentage Act (KPA) presumption of maternity in K.S.A. 2019 Supp. 23-2208(a)(4) by notoriously recognizing her maternity.

2.

A woman who seeks to establish parentage by using the presumption in K.S.A. 2019 Supp. 23-2208(a)(4) bears the initial burden to demonstrate the existence of the presumption. If she succeeds, the burden shifts to the party opposed to establishment of the mother and child relationship to rebut the presumption by clear and convincing evidence, by court decree establishing paternity or maternity of someone other than the presumed parent, or under K.S.A. 2019 Supp. 23-2208(c).

3.

K.S.A. 2019 Supp. 23-2208(c) provides that, if two conflicting parentage presumptions arise, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child" prevails.

4.

Under K.S.A. 2019 Supp. 23-2208(b), if a presumption under K.S.A. 2019 Supp. 23-2208(a)(4) is rebutted, the burden of going forward with evidence shifts back to the party seeking establishment of the parent and child relationship. That party must go forward with the evidence, and the ultimate burden can be discharged by a preponderance of the evidence.

5.

A woman seeking to establish parenthood who relies on the presumption of maternity under K.S.A. 2019 Supp. 23-2208(a)(4) need not show the existence of a written or oral coparenting agreement between her and the birth mother. She need only show she has notoriously recognized maternity and the rights and duties attendant to it at the time of the child's birth. In addition, in keeping with *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the court must ultimately be persuaded that the birth mother, at the time of the child's birth, consented to share her due process right to decision-making about her child's care, custody, and control with the woman who is claiming parentage under the KPA.

6.

Evidence in support of either party's position in a parentage action brought by a person seeking to establish a parent and child relationship by using the presumption in K.S.A. 2019 Supp. 23-2208(a)(4) may be direct or circumstantial, testimonial or documentary.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 7, 2019. Appeal from Butler District Court; DAVID A. RICKE, judge. Opinion filed November 6, 2020. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and the case is remanded with directions.

*Valerie L. Moore*, of The Law Offices of Valerie L. Moore, of Lenexa, argued the cause, and *Carolyn Sue Edwards*, of Law Offices of Carolyn Sue Edwards, P.A., of Wichita, was with her on the briefs for appellant.

*Christopher J. Vinduska*, of Klenda Austerman LLC, of Wichita, argued the cause, and *Alex P. Flores,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This case and *In re W.L.*, 312 Kan. __ (No. 119,536, this day decided), address whether the same-sex romantic partner of a woman who conceives through artificial insemination and gives birth during the couple's relationship can be recognized as a legal parent under the Kansas Parentage Act (KPA), even if the couple has not entered into a written or oral coparenting agreement.

In the district court, the judge ruled that the partner had no parental rights. A panel of our Court of Appeals affirmed that result. *In re M.F.*, No. 117,301, 2019 WL 2399482 (Kan. App. 2019) (unpublished opinion). We accepted the partner's petition for review.

We rule that such a partner can be recognized as a legal parent through use of K.S.A. 2019 Supp. 23-2208(a)(4) when the birth mother has consented to shared parenting at the time of the child's birth. We therefore reverse the district court's judgment and the panel decision affirming it; we remand to the district court for further proceedings consistent with this opinion.

3

K.L. and T.F. began a romantic relationship shortly after they met in October 2007. They moved in together in the fall of 2008, residing in an Andover home owned by K.L. Before T.F. moved in, she and K.L. opened a joint checking account. Eventually T.F. would testify that the account was set up so that both could use it for household expenses, including mortgage payments and repairs. T.F.'s name was added to the mortgage and deed in January 2009.

Very early in the relationship, T.F. told K.L. that she wanted "a lot" of kids. The parties do not dispute that T.F. always wanted children. K.L. would testify that she and T.F. differed about the number of children each wanted, but she agreed to having one child. T.F., on the other hand, would take the position that K.L. never wanted any children.

In June 2011, after K.L. lost her job, T.F. added K.L. to her employer-provided medical insurance coverage. K.L. and T.F. submitted affidavits that they were domestic partners and intended to continue their relationship indefinitely. T.F. would testify that she added K.L. to her insurance as a matter of financial necessity, rather than as a statement about the couple's status.

In 2012, T.F. began seriously considering using artificial insemination to have a baby, and she and K.L. attended a required pre-insemination session with social worker Renee Cristiano in November 2012. Cristiano's report stated, "[T.F.] believes her family will also support her decision to have [K.L.] appointed as a guardian." It also said that the couple planned "to be co-parents." T.F. would dispute the truth of these two statements in her eventual testimony.

4

T.F.'s first attempt at artificial insemination was unsuccessful. K.L. was not present for the procedure and was unaware of it until after the fact. T.F. would testify that the decision to undergo artificial insemination "was not a mutual decision. [K.L.] was not supporting the decision. I was doing it alone and I did not want her there. I was going to do this no matter what."

The women's testimony also would eventually conflict on how involved K.L. was in donor selection for the second insemination. T.F. paid for the procedure and for other medical expenses, as well as the session with Cristiano. K.L. was present for the second, successful procedure, and T.F. gave birth to M.F. on October 19, 2013.

The couple had not entered into a written coparenting agreement and never did so.

At the time of M.F.'s birth K.L.'s last name was used as a second middle name on the baby's birth certificate. T.F. would later testify that she felt pressure from K.L. to use the name, while K.L. would testify that she exerted no pressure on T.F. and was "very happy" when she found out that T.F. had included her name in the baby's. T.F. would later unilaterally drop K.L.'s last name from the baby's name.

In late November 2014, T.F. moved out of K.L.'s house and took 13-month-old M.F. with her. K.L. would testify that it was difficult for her to see M.F. after the couple's separation; she attributed the difficulty in part to T.F.'s failure to respond to messages.

T.F. eventually told K.L. that she could come to Inman, where T.F. had then settled, to see M.F., but T.F. forbade overnight stays. K.L. would testify that she did not take T.F. up on the offer to visit M.F. in Inman often; by the time she could drive to Inman after work, she said, M.F. would already be in bed. After a while, T.F. would not

5

let K.L. be around M.F. by herself at all, requiring K.L. to be accompanied by her mother.

K.L. petitioned to establish parentage in November 2015. In February 2016, the district judge heard three days of evidence.

In addition to the testimony already described above, the evidence from K.L. included copies of e-mails between herself and T.F. that were sent from 2007 to 2010 and dealt with the topic of children. When asked on cross-examination why there were no later, similar emails, K.L. said that she and T.F. might have had such discussions in person.

K.L. also testified that she and T.F. shared M.F.'s expenses "[f]or the most part" after the couple broke up. She said she "always offered when [she] was at Costco or Walmart, to see if [T.F.] needed anything."

T.F. testified that she and K.L. never considered formalizing their relationship with a commitment ceremony, but she also said K.L. had asked her "many times" to get married. T.F. always rejected the proposals.

T.F. acknowledged that she and K.L. had attended the session with Cristiano but characterized the statements made to and reported by Cristiano as convenient misrepresentations. She said there had been no real discussion of the differences between K.L. and herself about the issue of children because K.L. knew T.F. "needed this lady's approval to go forward [with the insemination]. And I know [K.L.] was afraid of losing me if she didn't do this for me. After we got home from this appointment we had an argument about it all because [K.L.] was like, '[W]e just lied to this lady!'"

T.F. denied that K.L. had shared in expenses related to M.F. Rather, when T.F. needed financial assistance to provide for M.F., she obtained it from her father. T.F. provided detailed account statements showing her expenditures for M.F.

While the couple was still living together, T.F. said, she and M.F. slept in one bedroom and K.L. in another. T.F. also testified that she was responsible for feeding, bathing, and putting M.F. to bed—sacrificing her social life while K.L. continued hers.

T.F. testified that there were multiple factors leading her to leave K.L. They included her "spirituality and sexuality," financial pressures, and concerns about the couple's relationship. T.F. denied that K.L. ever had a mother-child type of relationship with M.F.: "[M.F.] was my daughter, and [K.L.] was a woman I was living with."

After T.F. moved out, she began dating the man who is currently her husband. She testified that he would buy diapers and other things for M.F. without being asked. During this time, K.L. continued to try to convince T.F. to come back. T.F. began to question K.L.'s emotional stability and decided it was not in M.F.'s best interests to have overnight visits with her.

Other evidence at the hearing described K.L.'s presence at childbirth classes attended by T.F., the couple's decoration of a room in their home in anticipation of the baby's arrival, and a shower given by both women's families. T.F's written birth plan identified K.L. as the baby's "other parent," and K.L. was given a "mother" security bracelet at the hospital. The labor and delivery nurse testified that she understood K.L., who was present at M.F.'s birth, to be the baby's other intended mother. T.F. had sent K.L. Mother's Day cards "from" M.F., both before and after the baby's birth. The cards referred to K.L. as "Mama K" and "mother." K.L. opened a bank account in the name of

the baby with herself listed as a parent, but she never named M.F. as her child or dependent on any other official document until the month before this action was filed.

After all of the parties' evidence had been submitted, the district judge ruled from the bench. He first found that T.F. and K.L. had been in a committed same-sex relationship.

> "The evidence in this case is overwhelming that they had an approximate seven year relationship, they bought a house together, shared expenses, lived together in an intimate and committed relationship for a period of years. Outside relationships notwithstanding, the evidence in this case overwhelmingly suggested that they had just this type of committed same-sex relationship. Further, the Court puts great weight on this domestic partnership affidavit that sets forth very specific criteria that [T.F.] acknowledged in writing and represented officially to get insurance coverage that she—they had this very type of committed same-sex domestic partnership."

Despite that relationship, the judge said, the women made no joint decision to have children or to raise a child together.

> "Regarding the issue as to the joint decision to have children, the Court finds that the weight of evidence in this case suggests to this Court that [T.F.] wanted to have a child, and she wanted to have a child in the worst way, and that she was committed to doing so despite, the Court's belief, the position of her same sex partner. And, therefore, it is the belief of this Court that [T.F.] was going to go ahead with this regardless and that it was not a joint decision. It was a decision in which [K.L.] was consulted and provided some input and advice on, but the ultimate decision to have this child was [T.F.]'s. And the involvement of [K.L.] in this process was either required, or it was a decision after [T.F.] had decided to go ahead and do this, that [K.L.] essentially got on board and then assisted to the extent that she could in this planning and insemination process and during the pregnancy."

8

After consideration of "conflicting testimony," the judge concluded, "[I]t doesn't appear that the parties really ever had a true *meeting of the minds* as to a parenting *agreement*." (Emphases added.)

"Based on the evidence that's been presented in the case, it does appear that [T.F.] took on not only primary parenting responsibility, but overwhelmingly was the caring parent in the case. Parenting is more than just saying you're a parent, it's actually performing all of those actions that are necessary to raise an infant: feeding, getting up when they're sick, dressing them, bathing them, caring for them, making sure they have appropriate daycare when you can't be with them. These are all things that have to be done by a parent. It appears that the overwhelming evidence in the case is that [K.L.] was there, she was supportive, but the actual hands-on parenting that was done on a day-to-day basis was done overwhelmingly by [T.F.]. Therefore, the Court cannot find that there was actual joint responsibility shared during the year that they lived together. The Court also puts some significance on the fact that unlike the other case decisions, the time that the child was in a family unit home with these two partners was relatively short. Only for a period of about a year before their breakup.

"Regarding the—the name in this case, the Court does find that both of these parties names appear[] on the original birth certificate. The explanation to the Court by [T.F.] was that was an accommodation to [K.L.]. But the Court does find some significance in the fact that the name was not hyphenated. In other words, there was never an intention that this child would have a surname that includes the name of both parents. And that's the true meaning in this Court's view of a hyphenated surname, that every time that surname is used both of the parent's names also are used. That's not the case here. In fact, it would appear that [T.F.] never really recognized that [K.L.] was part of this child's name and, frankly, didn't use it. Now, it does appear to the Court that the evidence suggests that [K.L.] did consistently use it whenever she had the opportunity, but [T.F.] did not. Therefore, the Court finds that there is a distinction between the other cases, the appellate cases which this Court considers factors, and this one on the issue of name. Further, the Court does put some significance that when the parties separated that [T.F.] took it upon herself to remove [K.L.] from the birth certificate. I think that's

9

consistent with her view from the beginning that [K.L.] was there as an accommodation to [K.L.] and not because the parties actually intended that to be part of the used name of this child over the long-term.

"Regarding the factor as to how this child refers to [K.L.]. Quite frankly, by the time these parties broke up she was just too little to be speaking well enough to call anybody particularly anything that would be credible."

The judge then referenced *Frazier vs. Goudschaal*, 296 Kan. 730, 295 P.3d 542 (2013), which involved a same-sex couple who had entered into two written coparenting agreements concerning children conceived through artificial insemination. In that case

"there was evidence regarding what others such as teachers and daycare providers, how they treated these individuals. [Here,] [t]he Court does find it significant the testimony of the swim instructor and the daycare provider in this case that they dealt almost exclusively with one parent here, [T.F.], and saw [K.L.] only as kind of a—an associate role in the case and not as an active co-parent. The Court does put some weight on the fact that these individuals who dealt with the mother of the child, the biological mother of the child, as the one that made the decisions, the one that was actively involved, the one that got in the water with the child during swimming, and that [K.L.] did not.

"Now, the Court notes that in *Frazier vs. Goudschaal* there was also a proof of purchasing a home and shared bank accounts. As the Court noted earlier that does exist here. There was some co-mingling of responsibility of assets and, of course, it's undeniable that they did attempt to buy a house with one another. That, in the view of the Court, does not really help sort out the relationship of mother/child in this particular case.

"Also in *Frazier vs. Goudschaal* it's the Court's understanding from reading of the case that the parties equally shared parenting responsibilities after breakup. That didn't exist here. What appears to have happened in this case based on the evidence is that when the parties separated [T.F.] took her child, as she saw it, and moved away. Had [K.L.] acted promptly at that time asserting this is my daughter too, you can't do that, the

Court might put more weight on her construction of her relationship and role now. But the Court does put some significance on the fact that it was almost a full calendar year before she sought the involvement[] of the courts to enforce what she sees as a parent/child relationship. I do note that she contacted [T.F.] often. That she sought visitation and often exercised it. One might see that as being willing to accept the crumbs that [T.F.] would throw her. And I do note that she did exercise whatever contact that was offered with one notable exception and that is the Court sees some significance in the communication which was documented in the record where [T.F.] basically offered, you can come to Inman and see her anytime. Why [K.L.], who claims to be a mother, didn't exercise that opportunity when—when granted and offered, is beyond the Court. I would think that if you really missed that child like a mother would miss an absent child, you would go to Inman because I don't think that that would have been that great of a burden to exercise that kind of—of time with her under those circumstances. If that's what you can get, you go do it. And I don't believe that there was a sufficient explanation in the record as to why she didn't do that other than she really just wanted to see the parenting time, as she saw it, work differently and didn't want to make that concession.

"Ultimately it's the Court's role in this case to determine the existence of a mother/child relationship. It is undenied that [K.L.] had a relationship with this little girl. When they lived together I'm sure, as I noted earlier, if you're going to be around her every day I think she's just so sweet you're going to get attached to her. I don't doubt that for a bit. I also recognize this special grandmother-like relationship that [K.L.'s mother] seemed to develop with this child. However, it seems to the Court that [K.L.] can't stack the grandmother's relationship with this child onto hers to create a mother/child relationship."

The judge also concluded:

"The particular part of the paternity statute which must be proven here is that there was *open and notorious demonstrations of parenting* by [K.L.]. The Court finds here that the evidence suggests that her assertion of a role as a parent [of] this child were inconsistent, sporadic and incidental. She did not support her in any meaningful way financially. It would appear that [T.F.] was left to bear the entire financial responsibilities

11

for the child both when they were together and after. There's been no offer of child support in a formal sense. Virtually no proof of expenses that were paid by [K.L.] during the relationship. Again, anything that she did provide appears just to be gifts or incidental. Does not appear to establish a true commitment to use her resources to support a child in the same way that [T.F.] had to make an ongoing commitment to do. And as found earlier, the Court finds that it was [T.F.]'s responsibility starting with breast feeding, which is necessarily focused on her and tends to create more responsibility in one individual rather than the other, and from that time on she was the parenting figure for this child in the home.

. . . .

"[T]his Court has to be extremely hesitant to impress upon the life of this child a relationship which has not been clearly proven to exist, and the Court does find in this case that the evidence is insufficient for this Court to find a mother/child relationship between [K.L.] and [M.F.] in this case. And, therefore, the Court will deny the request for the Court to declare a mother/child relationship finding that [K.L.] in this case had a passive rather than an active role, finding specifically that she was caring but somewhat distanced from the child on day-to-day parenting responsibilities. That if she considered herself a true parent she would have claimed that the child was hers public[ly] and unequivocally which she did not do under the overall evidence in this case. She would have, in the view of the Court, been happy to name this child as a depend[e]nt or as a beneficiary on any legal document that she has. I note it's significant that on her life insurance she did not mention [M.F.] whatsoever as a daughter, but instead named other people as her beneficiaries. And the Court does believe that she should have acted sooner to enforce rights as a mother in this case if indeed she really did consider herself a mother in this case.

". . . [T]he Court finds that [T.F.] is the sole legal parent of this child and that she'll make the decisions regarding who this child sees and under what conditions she sees them." (Emphasis added.)

12

The judge's journal entry of judgment ultimately was filed in December 2016. K.L. attempted to appeal his decision but failed to file a timely docketing statement. After dismissal and reinstatement of the appeal, the case came before the Court of Appeals. See *In re M.F.*, 2019 WL 2399482, at *3.

K.L.'s brief to that court posed the following series of questions: (1) Was there a "meeting of the minds" to coparent? (2) Was there an open and notorious assertion of parenthood by K.L.? (3) Did T.F. exercise the parental preference doctrine in naming K.L. mother of M.F.? If so, could she change her mind and alter M.F.'s opportunity to have two parents? See 2019 WL 2399482, at *4.

T.F.'s brief before the Court of Appeals argued that K.L.'s attempt to establish parentage under a coparenting agreement or the KPA was doomed by the evidence against her, the credibility and weight of which could not be revisited on appeal. In addition, T.F. asserted, K.L.'s parental preference argument had been abandoned.

The panel recognized that the "meeting of the minds" language in K.L.'s first question and in the district judge's decision invited analysis of whether T.F. and K.L. had entered into a contract. Given the undisputed evidence that there was no written coparenting agreement, it treated the issue of the existence of an oral contract as one of pure fact. And it then ruled that, regardless of whether it reviewed the district court decision that there was no oral contract, no "meeting of the minds," under a negative finding or substantial competent evidence standard, K.L. would lose.

> "At trial, K.L. did not identify any 'essential elements' of the alleged oral coparenting agreement. Instead, she argued generally that she and T.F. had been 'on the same page' about coparenting and that '[f]or the most part,' they shared M.F.'s expenses before their breakup. T.F. denied K.L.'s allegations that they had agreed to share parenting and caregiving responsibilities, testifying that K.L. 'didn't have any responsibilities with

[M.F.]' At another point, when asked if she and K.L. had an 'agreement or arrangement regarding sharing of parental responsibilities for [M.F.],' T.F. replied, 'No.'" 2019 WL 2399482, at *6.

The panel then took up the district judge's conclusion that K.L. had not established a presumption of maternity by what he had termed "open and notorious demonstrations of parenting" of M.F., stating the ruling as "there was not an open and notorious assumption of parenting responsibilities for the child by [K.L.]." It said that it was measuring this ruling against the KPA's provision in K.S.A. 2019 Supp. 23-2208(a)(4), although the district judge had not cited that provision or expressly applied the burden shifting required by K.S.A. 2019 Supp. 23-2208(b).

"We interpret the district court's ruling as a finding that K.L. failed to meet her initial burden of proof to establish by a preponderance of the evidence a presumption of parentage. A district court's finding on whether an individual is a presumed parent under the KPA is a finding of fact. See *In re Paternity of E.G.S.*, No. 108,778, 2013 WL 2972697, at *3 (Kan. App. 2013) (unpublished opinion).

. . . .

"K.L. does not contend that the district court arbitrarily disregarded undisputed evidence, nor does she argue that the district court was motivated by any extrinsic consideration. Rather, she argues that there was more than sufficient evidence to support her claim that she notoriously asserted her parenthood of M.F. But all of the evidence cited by K.L. was disputed at trial. Essentially, K.L. asks this court to reweigh the evidence and find that the district court made the wrong decision when it found that *she had not notoriously asserted her parenthood*. But when reviewing a negative finding, '[a]n appellate court may not nullify a district court's disbelief of evidence, nor may it determine the persuasiveness of evidence that the district court may have believed.' *In re Estate of Rickabaugh*, 305 Kan. 921, 935, 390 P.3d 19 (2017).

14

"Even using K.L.'s proffered standard of review, there was sufficient evidence—viewed in the light most favorable to T.F.—to support the district court's finding that K.L. did not notoriously recognize her status as M.F.'s parent. T.F. testified that K.L. seldom went to M.F.'s pediatric appointments or help[ed] pay for them, nor did K.L. help pay for obstetric or gynecological services. T.F. testified that she and K.L. did not represent K.L. to others as M.F.'s parent. This testimony was corroborated by T.F.'s parents and there was evidence that M.F.'s swimming instructor, despite having met K.L., did not understand K.L. to be M.F.'s parent. T.F.'s father testified that he gave money to his daughter several times because K.L. never helped with M.F.'s financial needs. Also, K.L. did not take legal action to assert her parentage until a year after her relationship with T.F. ended, and she filed her case five days after T.F. and [her husband] were married.

"To be clear, K.L. presented substantial evidence that if found to be credible by the fact-finder would support her claim that she *notoriously represented herself to others as M.F.'s parent*. But the district court's decision denying K.L.'s petition reflects that the district court implicitly found T.F.'s testimony more credible than K.L.'s. The trial judge could observe the demeanor of the witnesses and was in the best position to assess their credibility. As we have already stated, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. *Gannon*, 298 Kan. at 1175-76. Based on our standard of review, K.L. has failed to show that the district court erred in finding that she did not *notoriously represent herself to others as M.F.'s parent*." (Emphases added.) *In re M.F.*, 2019 WL 2399482, at *7-8.

Finally, the panel declined to address the merits of K.L.'s third issue on the parental preference doctrine, agreeing with T.F. that it had not been properly preserved for appellate review. 2019 WL 2399482, at *8.

When K.L. petitioned this court for review, she articulated a single issue for consideration:

"The Court of Appeals found that under the Kansas Parentage Act (KPA) unmarried parties who have children through ART [Assisted Reproductive Technology] and not their own biology are required to show that a contract (either oral or written) existed. Is it inequitable to require a contract to establish parentage for non-married partners under the KPA for children born through ART?"

This court granted review, and both parties submitted supplemental briefs.

In her supplemental brief, K.L. restated the issues again, asking first whether the panel's requirement of a written coparenting agreement between nonmarried partners who were raising children was an incorrect interpretation of the KPA and caselaw and, second, whether the district judge and the panel erred in concluding that she failed to meet her burden of notoriously or in writing recognizing her parentage of M.F.

T.F.'s supplemental brief argued again that an appellate court cannot reweigh evidence and that a negative factual finding by a district judge cannot be overturned on appeal absent arbitrary disregard of undisputed evidence or reliance on an extrinsic consideration such as bias, passion, or prejudice. See *State v. Douglas*, 309 Kan. 1000, 1002-03, 441 P.3d 1050 (2019). She pointed out that the panel had *not* required K.L. to demonstrate the existence of a written coparenting agreement. But she urged this court to rule that the KPA nevertheless required either a biological or adoptive connection between a parent and child or a written coparenting agreement similar to those entered into by the parties in the *Frazier* case.

At oral argument before us, counsel for K.L. firmly and finally zeroed in on the single common legal question necessarily underlying several of the varying issue statements and arguments in her appellate briefs and the petition for review:  Did the district judge and, later, the Court of Appeals panel apply the correct legal standard to evaluate the evidence under the governing KPA provision, K.S.A. 2019 Supp. 23-

2208(a)(4)? She urged us to recognize error below, asserting that the district judge and the panel had demanded more of her than the plain language of the applicable KPA parentage presumption requires. In her view, all she had to demonstrate to meet the initial burden assigned to her by K.S.A. 2019 Supp. 23-2208(b) was her notorious recognition of her maternity of M.F., *not* "open and notorious demonstrations of parenting," in the district judge's original words, or "open and notorious assumption of parenting responsibilities," as the Court of Appeals described his ruling.

On questioning from the court, K.L.'s counsel argued not only that no oral or written coparenting contract was required but also that T.F. did not have to acquiesce in shared parenting with K.L. In her view, the presumption provision relied on by K.L. made K.L.'s maternity the legal equal of T.F.'s biological maternity. Each mother was as entitled as the other to the constitutional protection of the due process right to care, custody, and control of M.F. and to the shelter of the parental preference doctrine. K.L. did not have to perform any parental duties particularly well or even completely in order to be afforded treatment as a parent from the time of M.F.'s birth. Indeed, counsel asserted that K.L. had done all that she needed to do to meet the statutory requirement merely by filing her petition to launch this case in district court.

T.F.'s counsel initially focused his oral argument on distinguishing this case from *Frazier* because of the lack of a coparenting agreement between his client and K.L. He conceded that the district judge appeared to believe that the law already required such an agreement to recognize K.L.'s maternity, and he sought our formal recognition of that interpretation or extension of *Frazier*. When redirected to the language in K.S.A. 2019 Supp. 23-2208(a)(4) and asked to point out the provision for the agreement requirement he sought, he noted that the provision, enacted in 1985, had not been expected to apply to a same-sex relationship. This, in turn, forced him to acknowledge that K.S.A. 2019 Supp.

17

23-2220, also enacted in 1985, made KPA provisions applicable to a father and child relationship applicable to a mother and child relationship "insofar as practicable."

DISCUSSION

Before we reach the merits of this case, we pause to address whether K.L.'s briefing and petition for review preserved the issue on which she now desires a ruling—whether the district judge and the Court of Appeals applied the wrong legal standard in evaluating the evidence before them on the K.S.A. 2019 Supp. 23-2208(a)(4) presumption of maternity she had claimed and any other governing law. See Supreme Court Rule 8.03(b)(6)(C)(i) (2020 Kan. S. Ct. R. 52) (Supreme Court will not consider issue not raised before Court of Appeals or issues not presented, fairly included in petition for review, cross-petition, conditional cross-petition; court may address plain error not presented); Supreme Court Rule 8.03(j)(5) (2020 Kan. S. Ct. R. 52) (Supreme Court may consider, decide issues decided by district court, presented to but not decided by Court of Appeals).

Aside from challenging K.L.'s apparent misunderstanding that the Court of Appeals absolutely required a coparenting agreement, T.F. has not taken explicit issue with the adequacy of K.L.'s issue preservation. She continues to focus instead on the district judge's fact-finding, asserting that the evidence in support of her was ample and appropriately weighed to compel judgment in her favor. On the subject of the governing law, T.F. is more than ready to engage with K.L. As mentioned above, she urges this court to go beyond its earlier statements about K.S.A. 2019 Supp. 23-2208(a)(4) and to extend the holding of the *Frazier* case to require proof of the existence of a written coparenting agreement between the parties.

18

Under these circumstances, we are willing to exercise our discretion to consider and decide the merits of the controlling legal issue in this case, overlooking some earlier changeability and lack of clarity in K.L.'s briefs and petition for review. See *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017) (preservation prudential rather than jurisdictional rule). K.L. has always invoked the governing statute in the district court and the Court of Appeals; she has consistently challenged the propriety of the district judge's ruling against her, which, we believe, inevitably demands at least some examination of the legal framework he employed as well as the relevance and sufficiency of the evidence presented under that standard; this case concerns a rapidly developing area with few guideposts in our caselaw; and, finally, T.F. does not invoke lack of preservation to stop us from reaching the merits. See *State v. Boeschling*, 311 Kan. 124, 128, 458 P.3d 234 (2020) (failure to raise lack of preservation of issue before Court of Appeals waives, abandons preservation as issue on petition for review without cross-petition explicitly raising issue).

*Kansas Parentage Act*

Unless a child's parentage is governed by the Indian Child Welfare Act, 25 U.S.C. § 1901 (2016) et seq., the KPA applies to parentage actions such as this one. K.S.A. 2019 Supp. 23-2201(b). A "'parent and child relationship' means the legal relationship existing between a child and the child's biological or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations." K.S.A. 2019 Supp. 23-2205. The "parent and child relationship" "includes the mother and child relationship and the father and child relationship." K.S.A. 2019 Supp. 23-2205. Further, it "extends to every child and to every parent, regardless of the marital status of the parents." K.S.A. 2019 Supp. 23-2206.

In addition to the biological and adoptive relationships explicitly recognized under K.S.A. 2019 Supp. 23-2205, a child conceived through artificial insemination by a consenting husband and wife is "considered at law in all respects the same as a naturally conceived child of the husband and wife so requesting and consenting to the use of such technique." K.S.A. 2019 Supp. 23-2302. The consent required under the artificial insemination act is a written acknowledgment by both the husband and the wife, as well as the person who performed the insemination procedure. K.S.A. 2019 Supp. 23-2303. The original document may be filed in district court in the same manner as adoption papers. K.S.A. 2019 Supp. 23-2303.

Under a strict reading of the artificial insemination act, the procedure would only be available to a married couple, and the consent requires a written document. But our Court of Appeals has long held that a man may be estopped from relying on the lack of a written document to avoid paternity, and unmarried birth mothers have been permitted to use the procedure. See *R.S. v. R.S.*, 9 Kan. App. 2d 39, 44, 670 P.2d 923 (1983) (husband who with wife orally consents to treating physician that wife be inseminated for purpose of producing child of their own estopped to deny fatherhood of child); see also *In re K.M.H.*, 285 Kan. 53, 72, 169 P.3d 1025 (2007) (although 1973 uniform act governed paternity of children born only to married women as result of artificial insemination, version adopted by Kansas omitted word "married"); 285 Kan. at 55-56 ("The mother, S.H., is an unmarried female lawyer who wanted to become a parent through artificial insemination from a known donor."); cf. Unif. Parentage Act § 704 (Unif. Law Comm'n 2000) (failure of man to sign consent does not preclude finding paternity if woman, man openly held child out as their own); Unif. Parentage Act § 704 (Unif. Law Comm'n 2017) (expanding on 2000 Act's conditions for establishing parentage for unmarried partners; adopting gender-neutral terminology).

In short, the artificial insemination act and the KPA can work together to create complementary fictions:  one that the husband of the woman undergoing the procedure is the actual biological father of the child produced, see K.S.A. 2019 Supp. 23-2302, and one that the sperm donor is not the actual biological father. See K.S.A. 2019 Supp. 23-2208(f).

The KPA also provides that the parentage relationship—i.e., the legal relationship incident to which the law confers or imposes rights, privileges, duties, and obligations—between a child and a mother who does not adopt the child may be established "by proof of [the mother] having given birth to the child *or under this act*." (Emphasis added.) K.S.A. 2019 Supp. 23-2207(a).

That said, the sections of the KPA used to establish a parent-child relationship "under this act" were originally phrased only in terms of paternity. See K.S.A. 2019 Supp. 23-2208 (presumption of paternity); K.S.A. 2019 Supp. 23-2209 (determination of father-child relationship). We have previously observed, however, that this 1985 wording is broadened by other 1985 wording in K.S.A. 2019 Supp. 23-2220, which provides that any "interested party may bring an action to determine the existence or nonexistence of a mother and child relationship. Insofar as practicable," the KPA provisions applicable to determine a father and child relationship also are used to determine a mother and child relationship. See *Frazier*, 296 Kan. at 746-47.

It is also important to consider that, since the enactment of the statute, the United States Supreme Court has ruled that same-sex couples have a federally protected constitutional right to marry just like that of couples of different sexes. See *Obergefell v. Hodges*, 576 U.S. 644, 675, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015). Recognition of this right has the potential to affect how the KPA is applied to establish a person has the legal rights and duties of a parent.

21

This general introduction to the KPA and *Obergefell* brings us to K.S.A. 2019 Supp. 23-2208, the statute at the heart of K.L.'s challenge. It reads in pertinent part:

"(a) A man is presumed to be the father of a child if:

(1) The man and the child's mother are, or have been, married to each other and the child is born during the marriage or within 300 days after the marriage is terminated by death or by the filing of a journal entry of a decree of annulment or divorce.

(2) Before the child's birth, the man and the child's mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is void or voidable and:

(A) If the attempted marriage is voidable, the child is born during the attempted marriage or within 300 days after its termination by death or by the filing of a journal entry of a decree of annulment or divorce; or

(B) if the attempted marriage is void, the child is born within 300 days after the termination of cohabitation.

(3) After the child's birth, the man and the child's mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is void or voidable and:

(A) The man has acknowledged paternity of the child in writing;

(B) with the man's consent, the man is named as the child's father on the child's birth certificate; or

22

(C) the man is obligated to support the child under a written voluntary promise or by a court order.

(4) The man notoriously or in writing recognizes paternity of the child, including but not limited to a voluntary acknowledgment made in accordance with K.S.A. 23-2223 or K.S.A. 65-2409a, and amendments thereto.

(5) Genetic test results indicate a probability of 97% or greater that the man is the father of the child.

(6) The man has a duty to support the child under an order of support regardless of whether the man has ever been married to the child's mother.

"(b) A presumption under this section may be rebutted only by clear and convincing evidence, by a court decree establishing paternity of the child by another man or as provided in subsection (c). If a presumption is rebutted, the party alleging the existence of a father and child relationship shall have the burden of going forward with the evidence.

"(c) If two or more presumptions under this section arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control."

Subsection (a) sets forth a series of presumptions of paternity and maternity—the latter by operation of K.S.A. 2019 Supp. 23-2220 and, where marriage is a factor, the binding federal constitutional holding of *Obergefell*. Because none of these statutory presumptions involves adoption, they must, by process of elimination, concern legal recognition of a "biological" relationship between the presumptive parent and child. See K.S.A. 2019 Supp. 23-2205 (limiting parent and child relationship to biological and adoptive). Plainly, in circumstances such as the one before us, when the known egg of only one of the two women in a same-sex couple is fertilized through artificial

23

insemination, any "biological" link to the woman's partner of the same sex is a legal fiction. As recognized in *Frazier*, the legal fictions underlying the statutory presumptions of paternity or maternity can be used as the first step in establishing the legal fiction that a non-biological parent is to be treated in law as the biological parent, i.e., bears the rights and duties attendant to a legally binding relationship created before any court's adjudication. See *Frazier*, 296 Kan. at 745-46 ("the only constraint to bringing an action to determine the existence of a mother and child relationship" is that the petitioner be an "interested party"; suggestion that "interested party" synonymous with "biological" or "adoptive" parent fails to consider other provisions of KPA); cf. K.S.A. 2019 Supp. 23-2302 (child born as result of artificial insemination considered at law in all respects the same as naturally conceived child of husband and wife). The creation of these legal fictions was and remains the choice of our Legislature, which has not reacted to 2013's *Frazier* or 2015's *Obergefell* with any relevant amendment of the KPA. See *State v. Jordan*, 303 Kan. 1017, 1021, 370 P.3d 417 (2016) (legislative inaction may not be strongest indicator of legislative purpose but *an* indicator).

In addition to the legal fictions discussed above, Kansas law endorses at least one more fiction of biological parenthood. In *In re Marriage of Ross*, 245 Kan. 591, 602, 783 P.3d 331 (1989), this court held that, when a statutory presumption of paternity has arisen, before ordering a blood test to verify that a presumed parent is a biological parent, a district judge must consider the best interests of the child who has developed a parental relationship with another. Shifting parenthood based on actual biology alone could be detrimental to the emotional and physical wellbeing of any child. 245 Kan. at 602.

In short, as we recognized in *Frazier*, see 296 Kan. at 739, 745-47, and as a Court of Appeals panel has more recently recognized in *Kline v. Holmes*, No. 118,067, 2018 WL 1659927, at *4-5 (Kan. App. 2018) (unpublished opinion), biology is not necessarily destiny under the KPA.

The first step for a woman seeking legal recognition of a parent-child relationship under the KPA is to satisfy one of the presumptions of maternity outlined in K.S.A. 2019 Supp. 23-2208(a).

The first three presumptions are tied to the birth mother's marital status before or after the child is born. See K.S.A. 2019 Supp. 23-2208(a)(1) (child born during birth mother's marriage to potential presumptive parent or within 300 days after termination of marriage); subsection (a)(2) (birth mother attempted to marry potential presumptive parent before child's birth in solemnized ceremony in apparent compliance with law, although marriage void or voidable); subsection (a)(3) (after child's birth, birth mother and potential presumptive parent married or attempted to marry and potential presumptive parent has [A] acknowledged paternity or maternity in writing; [B] with potential presumptive parent's consent, potential presumptive parent named on child's birth certificate; or [C] potential presumptive parent obligated to support child under written voluntary promise or court order). These marriage-based presumptions are based on the "ancient presumption of . . . legitimacy." See *Bariuan v. Bariuan*, 186 Kan. 605, Syl. ¶ 3, 352 P.2d 29 (1960) ("ancient presumption of the legitimacy of a child born in wedlock is one of the strongest presumptions known to the law").

The remaining three presumptions may apply independent of the birth mother's marital status. Subsection (a)(4) is created if a potential presumptive parent "notoriously or in writing recognizes [maternity] of the child." This acknowledgment can occur through execution of a Voluntary Acknowledgment of Paternity form. The principle embodied in subsection (a)(4) predates the KPA and has its roots in a determination of legitimacy in the context of inheritance. See *Arndt v. Arndt*, 101 Kan. 497, 499, 167 P. 1055 (1917) ("The parentage alone is not sufficient to entitle an illegitimate child to share in the father's estate. Under our statute illegitimates are entitled to inherit from the father

25

'whenever they have been recognized by him as his children; but such recognition must have been general and notorious, or else in writing.'"); see also *Carty v. Martin*, 233 Kan. 7, 10-11, 660 P.2d 540 (1983) (paternity may be established through adjudication or acknowledgment). Subsection (a)(5) creates a presumption if genetic testing of the potential presumptive parent indicates a greater than 97% chance of an actual biological link. The final presumption is created if the potential presumptive parent "has a duty to support the child under an order of support regardless of whether the [potential presumptive parent] has ever been married to the child's mother." K.S.A. 2019 Supp. 23-2208(a)(6).

The burden to prove an initial presumption of paternity or maternity under K.S.A. 2019 Supp. 23-2208(a) rests on the party seeking to establish the existence of a parent-child relationship. It is the first in a series of shifting evidentiary burdens set up by K.S.A. 2019 Supp. 23-2208(b). If the party alleging existence of a parent-child relationship succeeds in establishing a presumption, then the burden shifts to the other party. K.S.A. 2019 Supp. 23-2208(b). That party may rebut the presumption of a legal parent-child relationship with attendant rights and duties only by clear and convincing evidence, by court decree establishing paternity or maternity of someone other than the potential presumed parent, or under subsection (c) of K.S.A. 2019 Supp. 23-2208. Subsection (c) provides that, if two conflicting presumptions arise, "the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child" prevails. K.S.A. 2019 Supp. 23-2208(c). If a presumption is rebutted, the burden shifts back to the party seeking recognition of the parent-child relationship, who has "the burden of going forward with the evidence." K.S.A. 2019 Supp. 23-2208(b). The ultimate burden placed on the party seeking recognition of the relationship can be discharged by a preponderance of the evidence, as a "clear and convincing evidence" standard is not specified in the way it is on rebuttal of the initial presumption. See *Landrum v. Goering*, 306 Kan. 867, 878, 397 P.3d 1181 (2017) (inclusion of language in

26

one section, exclusion in another shows Legislature's intention to differentiate in meaningful way).

In this case, we are concerned with the presumption set out in K.S.A. 2019 Supp. 23-2208(a)(4): "The [woman] notoriously or in writing recognizes [maternity] of the child." Under the plain language of the statute, see *State v. Carter*, 311 Kan. 206, 213, 459 P.3d 186 (2020) (usual statutory interpretation practice gives effect to plain meaning of clear statutory language), if K.L. is able to demonstrate that this presumption arose— either because of her open recognition of M.F. as her child or because she has said essentially the same thing in writing—then the burden shifts to T.F. to rebut the presumption by one of the statutorily prescribed methods. K.S.A. 2019 Supp. 23-2208(b), (c). If T.F. succeeds, then the burden shifts back to K.L. to go forward with evidence. K.S.A. 2019 Supp. 23-2208(b). It is important that the statute does not identify any particular type of evidence that will satisfy any of these shifting burdens, other than explicitly giving a person in K.L.'s position the option of proving a writing to satisfy one of the alternatives giving rise to the initial presumption. It is also important that it does not demand that any party be able to show the existence of a written coparenting agreement in order to prevail. It also does not demand consideration of the best interests of the child.

Frazier v. Goudschaal *and Later Kansas Cases*

Before continuing with more than theoretical application of the statutory provisions set out above, we must also address how earlier Kansas caselaw has or has not affected that application.

The parties, the district judge, and the Court of Appeals panel have all pointed to this court's decision in *Frazier*, 296 Kan. 730. In that case, Kelly Goudschaal and Marci

27

Frazier had been in a long-term same-sex relationship, during which Goudschaal gave birth to two children after conceiving through artificial insemination. Both Goudschaal and Frazier had executed written coparenting agreements in conjunction with the children's births. Each of the agreements explicitly addressed the contingency of a later breakup and identified Frazier as a "de facto parent." The agreements also specified that Frazier's

> "'relationship with the children should be protected and promoted'; that the parties intended 'to jointly and equally share parental responsibility'; that each of the parties 'shall pay the same percent of [child] support as her net income compares to [their] combined net incomes'; 'that all major decisions affecting [the] children . . . shall be made jointly by both parties'; and that in the event of a separation 'the person who has actual physical custody w[ould] take all steps necessary to maximize the other's visitation' with the children. In addition, both a consent for medical authorization and a durable power of attorney for health care decisions were executed. Further, each woman executed a last will and testament that named the other as the children's guardian." 296 Kan. at 733.

After the couple split, Frazier filed a petition to enforce the coparenting agreements, and Goudschaal moved to dismiss, claiming the district court "lacked subject matter jurisdiction to address Frazier's requests for child custody or parenting time." 296 Kan. at 734. The district judge concluded there was jurisdiction and "determined that an award of joint custody was in the best interests of the children." 296 Kan. at 735. Goudschaal was awarded residential custody; Frazier was ordered to pay monthly child support and granted "reasonable parenting time." 296 Kan. at 735.

On appeal, this court resolved first whether Frazier had standing to seek custody, then whether the district court had jurisdiction to award custody, and, finally, whether the coparenting agreement was valid and thus unenforceable. The court discussed provisions in the KPA, identical in content to those now in effect but numbered differently because

28

of a 2011 recodification, on its way to holding that Frazier had standing and that the district court had jurisdiction:

"Frazier also contended that she had a mother and child relationship with both children, in all respects other than biology. Accordingly, the trial court looked to the KPA provision that permits any interested party to bring an action to determine the existence or nonexistence of a mother and child relationship. K.S.A. 38-1126 [now K.S.A. 2019 Supp. 23-2220]. Goudschaal challenges that holding by pointing to the definition of parent and child relationship in K.S.A. 38-1111 [now K.S.A. 2019 Supp. 23-2205], which speaks to the legal relationship between the child and the child's *biological or adoptive* parents. In essence, Goudschaal argues that one must claim to be a biological or an adoptive parent in order to invoke the jurisdiction of the court pursuant to K.S.A. 38-1126 [now K.S.A 2019 Supp. 23-2220].

"But the only constraint to bringing an action to determine the existence of a mother and child relationship set forth in K.S.A. 38-1126 [now K.S.A. 2019 Supp. 23-2220] is that the petitioner be an 'interested party.' Goudschaal's suggestion that only a biological or an adoptive parent can be an 'interested party' under [K.S.A.] 38-1126 [now K.S.A. 2019 Supp. 23-2220] fails to consider the other provisions of the KPA. Specifically, K.S.A. 38-1114(a) [now K.S.A. 2019 Supp. 23-2208(a)] provides for the presumptive establishment of a father and child relationship in certain circumstances . . . .

"Obviously, except for subsection (5), the parental relationship for a father can be legally established under the KPA without the father actually being a biological or adoptive parent. That is important because K.S.A. 38-1113 [now K.S.A. 2019 Supp. 23-2207(a)] states that a mother 'may be established . . . under this act [KPA]' and K.S.A. 38-1126 [now K.S.A. 2019 Supp. 23-2220], dealing with the determination of the mother and child relationship, specifically incorporates the provisions of the KPA applicable to the father and child relationship, insofar as practicable. A harmonious reading of all of the KPA provisions indicates that a female can make a colorable claim to being a presumptive mother of a child without claiming to be the biological or adoptive mother,

and, therefore, can be an 'interested party' who is authorized to bring an action to establish the existence of a mother and child relationship.

. . . .

"In short, we find that the district court had the authority . . . to determine the existence or nonexistence of a mother and child relationship between Frazier and the two children; to determine the validity and effect of the coparenting agreement; and to enter such orders with respect to child custody, parenting time, and child support that are in the best interests of the children." 296 Kan. at 745-47.

The court ultimately summarized the basis for its holding that the coparenting agreement did not violate public policy:

"[T]he coparenting agreement before us cannot be construed as a prohibited sale of the children because the biological mother retains her parental duties and responsibilities. The agreement is not injurious to the public because it provides the children with the resources of two persons, rather than leaving them as the fatherless children of an artificially inseminated mother. No societal interest has been harmed; no mischief has been done. . . . [T]the coparenting agreement here contains 'no element of immorality or illegality and did not violate public policy,' but rather 'the contract was for the advantage and welfare of the child[ren].' Further, the agreement provides the children with '"substantive legal equality . . . regardless of the marital status of their parents. [Citations omitted.]"'" *Frazier*, 296 Kan. at 755.

Our *Frazier* decision thus invoked the KPA to settle the standing and jurisdiction questions it faced, observing that its parenting presumptions might be invoked to expand the definition of a biological parent to include those for whom an actual biological link was impossible but the creation of a legal fiction appropriate. What *Frazier* did *not* do is address exactly how the presumptions could be proved or defeated. It need not do so,

30

because the presumption was not in play but for establishing the threshold conditions of standing and jurisdiction.

The rest of the opinion focused on the *entirely independent* basis alleged to support Frazier's parenthood—the parties' two written coparenting agreements and their consistency with Kansas public policy. The agreements stood alone in *Frazier* because of their explicit designation of Frazier as a de facto parent with all of the rights and responsibilities of the birth mother. The agreements were not significant because they were used as evidence to satisfy any party's burden under the KPA. *Frazier* did not stand for the proposition that a same-sex partner of a birth mother must bring a coparenting agreement to court if she wants to have her parentage determined.

Shortly after *Frazier* was decided, a Court of Appeals panel demonstrated that it understood the limits of its references to and reliance upon the KPA. See *Downs v. Gilmore*, No. 108,176, 2013 WL 1010667 (Kan. App. 2013) (unpublished opinion). The panel ruled that a woman who was the same-sex partner of a birth mother had standing to claim maternity, even though the parties had no written coparenting agreement. It said:

> "We do not consider the lack of a written coparenting agreement, which was present in *Frazier*, of any significance in determining the standing issue . . . . [The (a)(4)] presumption has two paths—one in which the parent 'notoriously' recognizes parentage, meaning the parent has openly recognized the child, and another in which the parent does so 'in writing.' Either suffices . . . for a supposed father, and our Supreme Court applied [the presumption] to a case involving a supposed mother in *Frazier*." *Gilmore*, 2013 WL 1010667, at *4.

As a result, the panel reversed the district court's dismissal of the case for lack of standing and remanded. See 2013 WL 1010667, at *4.

Five years later, in *Kline*, 2018 WL 1659927, at *5-6, a different Court of Appeals panel proceeded beyond the standing question. It reviewed a case in which the district judge had not only recognized that a same-sex partner of a birth mother could petition for recognition under the KPA but also ruled that the evidence before her—even without a written or oral coparenting agreement between the parties—established that the partner "'openly and notoriously acknowledged being a parent to the minor child since prior to birth, and therefore is determined . . . to be a parent.'" 2018 WL 1659927, at *4.

In that case, the panel first identified the issue as whether the district judge had abused her discretion by erring as a matter of law, finding parenthood despite the absence of an actual biological or adoptive link to the child. The panel observed that the KPA's (a)(4) presumption could lead to establishment of a legal fiction of biological parenthood in such a case. "*Frazier* is a gateway that allows a woman to utilize practicable provisions of the Act in support of her claim of parentage. In the context of this case, [the partner's] argument that she meets the 'notorious' presumption of parentage has a lawful foundation." 2018 WL 1659927, at *5.

Yet the panel reversed the district court's judgment because it agreed with the birth mother that the judge erred by using the establishment of the initial presumption as the final test for the existence of parentage. In the panel's view, the judge failed to apply the burden-shifting rubric of K.S.A. 2016 Supp. 23-2208(b), overlooking her responsibility to decide whether the birth mother rebutted the presumption by clear and convincing evidence and then whether the partner overcame that rebuttal by going forward with evidence. See 2018 WL 1659927, at *6.

We agree that the district judge in *Kline* erred by failing to articulate any application of the burden-shifting rubric, if, in fact, it occurred. Without explicit reference to the requirements of the statute, the panel had little choice but to send the case back for

further express analysis of the evidence by her. See *State v. Hoge*, 283 Kan. 219, 221-22, 150 P.3d 905 (2007) (meaningful appellate review precluded when trial court's findings of fact, conclusions of law inadequate to disclose controlling facts, basis for court's findings); see also *State v. Mattox*, 305 Kan. 1015, 1035, 390 P.3d 514 (2017) (appellate court does not reweigh evidence, assess credibility, resolve evidentiary conflicts). But we do note that the panel's recitation of the evidence the judge relied upon to reach her ultimate decision may have had as much or more to do with the question of the birth mother's rebuttal of the presumption by clear and convincing evidence or the partner's further proof than it did with the initial presumption. According to the panel, the district judge relied on evidence that the birth mother sent pregnancy announcements including the partner's name, agreed to the partner being listed on baby shower invitations, and referred to the partner as "mom" in a time capsule email intended to be read by the child at a later time. It appears to us that all of these items of evidence would be material and probative on the birth mother's attitude toward her partner's maternity and not particularly enlightening on whether the partner herself notoriously recognized her own maternity or intended to take on the legal rights and duties of parenthood that attach to it.

*Other Relevant Law*

Two other legal parameters need to be discussed briefly before we move to the question of whether this case was resolved correctly in the district court and the Court of Appeals. The first deals with the right of a parent to make decisions about the care, custody, and control of his or her child. The second deals with the status of Kansas' subscription to the parental preference doctrine mentioned above.

In a plurality opinion in *Troxel v. Granville*, 530 U.S. 57, 60, 73, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the United States Supreme Court held that a Washington state statute that allowed "'[a]ny person' to petition a superior court for visitation rights 'at any

time,' and authorize[d] that court to grant such visitation rights whenever 'visitation may serve the best interest of the child'" was unconstitutional. After acknowledging precedent that recognized the fundamental due process right of a parent to make decisions concerning the care, custody, and control of the parent's child, the court held the "breathtakingly broad" statute meant a "court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision file[d] a visitation petition, based solely on the judge's determination of the child's best interests." 530 U.S. at 67; see also *Skov v. Wicker*, 272 Kan. 240, 243, 32 P.3d 1122 (2001) ("Absent a finding of unfitness, under *Troxel . . .* a parent has the right to decide with whom his or her child has contact.").

The plurality's conclusion was based, in part, on the statute's lack of deference to a fit parent's choices. And it warned that courts should proceed with caution in this area of the law.

As the Delaware Supreme Court has noted, however, *Troxel* is inapposite when a person seeks judicial recognition of an existing parent-child relationship.

"The issue here is not whether the Family Court has infringed [the biological mother's] fundamental parental right to control who has access to [the child] by awarding [the non-biological mother] co-equal parental status. Rather, the issue is whether [the non-biological mother] is a legal 'parent' of [the child] who would also have parental rights to [the child]—rights that are co-equal to [the biological mother's]. This is not a case, like *Troxel,* where a third party having no claim to a parent-child relationship (*e.g.,* the child's grandparents) seeks visitation rights. [The non-biological mother] is not 'any third party.' Rather, she is a (claimed) *de facto* parent who (if her claim is established, as the Family Court found it was) would also be a legal 'parent' of [the child]. Because [the non-biological mother], as a legal parent, would have a co-equal 'fundamental parental interest' in raising [the child], allowing [the non-biological mother] to pursue that interest through a legally-recognized channel cannot unconstitutionally infringe [the biological

34

mother's] due process rights. In short, [the biological mother's] due process claim fails for lack of a valid premise." *Smith v. Guest*, 16 A.3d 920, 931 (Del. 2011).

The parental preference doctrine, recognized and applied in Kansas, see *In re Guardianship and Conservatorship of B.H.*, 309 Kan. 1097, Syl. ¶ 2, 442 P.3d 457 (2019), is defined as the "principle that custody of a minor child should ordinarily be granted to a fit parent rather than another person." Black's Law Dictionary 1341 (11th ed. 2019). It thus generally prevents an award of child custody to a third person over a parent, but it does not distinguish between fit parents or prevent a fit parent from making a choice to share custody with another. See *Frazier*, 296 Kan. at 751 ("where two fit parents knowingly, intelligently, and voluntarily waive their parental preference by entering into a custody agreement with a third party that is in the best interests of the child, the court will enforce the agreement rather than second guess the parents' decision") (citing *In re Marriage of Nelson*, 34 Kan. App. 2d 879, 125 P.3d 1081 [2006]). In short, although the parental preference doctrine, like *Troxel*'s recognition of a parent's due process rights, counsels protection of a parent's choices, we have recognized that such choices, freely made, can cut against a parent's later-developing druthers.

*Application of Controlling Law*

All of the foregoing has been a lengthy—but necessary—prelude to what turns out to be our fairly straightforward resolution of this case. It turns initially on the plain language of the statute, with a constitutional overlay demanded by *Troxel*, 430 U.S. at 72-75.

To recap, K.L. seeks judicial recognition of her legal parentage relationship with M.F.—i.e., a relationship incident "to which the law confers or imposes rights, privileges, duties and obligations." See K.S.A. 2019 Supp. 23-2205. She wants to employ the legal

fiction permitted through the KPA by invoking the presumption in subsection (a)(4) of K.S.A. 2019 Supp. 23-2208, because she "notoriously . . . recognize[d]" her maternity of M.F. If she can succeed in demonstrating that this presumption arose, then, under subsections (b) and (c), T.F. must rebut the presumption by clear and convincing evidence that no such legal relationship ever existed or by showing the district judge a court decree establishing paternity or maternity of another individual or by invoking a competing presumption under (c). If T.F. succeeds using one of these methods to rebut the initial presumption in K.L.'s favor, then K.L. bears the burden of going forward with evidence.

Evidence of what? It depends. If the parties have remained focused on the existence or nonexistence of the one (a)(4) presumption, then evidence material and probative of it is *all* that matters. The question is whether someone became a parent, not whether he or she was a good one or, even less, whether he or she was a worthy partner to the birth mother. If, instead, competing presumptions have arisen, then facts that may ultimately support or defeat either of them are pertinent.

But let us be clear: *Frazier* did not demand more than the KPA language. The couple in that case happened to have written agreements that referred to the partner of the birth mother as a de facto parent. Our recognition of that reality was not the equivalent of this court requiring such documents or their oral equivalents in any parentage case pursued by someone who can show standing and subject matter jurisdiction under subsection (a)(4). *Downs* and *Kline* were both correct in this respect; neither required that one or the other party be able to demonstrate the existence of a "meeting of the minds" to support a written or oral coparenting agreement. Nor did they require satisfaction of any particular test for a de facto, psychological, equitable, or functional parent. See *In re Custody of H.S.H.-K.*, 193 Wis. 2d 649, 658, 533 N.W.2d 419 (1995) (elements for creating de facto parental relationship); Elrod, *A Child's Perspective of Defining A*

36

*Parent: The Case for Intended Parenthood*, 25 BYU J. Pub. L. 245, 261-63 (2011) (discussing "parent by estoppel," psychological parents, and de facto parents). *Frazier* should not be overread to do so.

All of this means that there was error below. Neither the KPA nor this court have required proof of the sorts of things the district judge and the Court of Appeals explicitly focused on here when analyzing whether the evidence was adequate. The question when conducting the statutory analysis was *not* whether K.L. engaged in "open and notorious demonstrations of parenting" or "open and notorious assumption of parenting responsibilities" for M.F. It simply was not necessary that she demonstrate she was an attentive, hands-on, involved mother. Rather, she had to show that she notoriously recognized her maternity, including the rights it would give her and the duties it would impose upon her. The two courts' focus, under the statutory language that our Legislature has not seen fit to change, needed to be on whether K.L. had qualified as one of M.F.'s two parents, not on whether she had later turned out to be a model of parenting success.

The judgment of the district court and the decision of the Court of Appeals affirming it must be reversed and this case must be remanded to the district court for the judge to take another look at the evidence under the analysis pattern set out above. As in *Kline*, the judge failed to articulate his application of the burden shifting required under the statute. Perhaps more critical, the evidence on which he focused appeared to be if not the wrong evidence, at least the right evidence as material and probative to support the wrong legal conclusion. He needed to determine in the first instance whether K.L. notoriously acknowledged her maternity. That was the sole initial issue, not whether, once such an acknowledgment occurred, she performed her duties admirably. If K.L.'s maternity is established, there will no doubt be ample opportunity later in the progress of this case for the court to evaluate her behavior to determine how much she should be permitted to be involved in M.F.'s life.

Before we return this case to the district court, however, we must give additional guidance for the proceedings on remand.

First, as established above, neither the KPA's plain language nor *Frazier* requires proof of a written or oral coparenting agreement between the parties. The district judge need not search for a "meeting of the minds." But we are nevertheless persuaded by *Troxel* that proof T.F. implicitly or explicitly *consented* to share parenting with K.L. at the time of M.F.'s birth is indispensable to constitutional application of the statutory presumption at issue. Such a consent to shared parentage does not sever or waive T.F.'s due process right to be a parent; provided K.L. has met the statutory requirement of recognition of her maternity, it merely endows K.L. with the same and equal right. But we are nevertheless wary of allowing a court to show zero deference to T.F.'s choices for her child. To interpret subsection (a)(4) of K.S.A. 2019 Supp. 23-2208 to allow anyone—even one with no relationship of any kind with the birth mother—to unilaterally pursue parenthood under this presumption has the potential to lead to unconstitutional as well as absurd results. We habitually assume that at least the latter could not have been the intention of our Legislature. See *Hays v. Ruther*, 298 Kan. 402, 406, 313 P.3d 782 (2013) (judicial interpretation of statutes should avoid absurd or unreasonable results).

Moreover, we are convinced that this *Troxel* overlay on the statute harmonizes it with Kansas' previous application of the parental preference rule, as described above, and with our recent recognition that a pregnant woman has a liberty interest she may vindicate by controlling decisions about whether to carry a pregnancy to term. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 680, 440 P.3d 461 (2019).

A birth mother's consent to share parenting may be implicit or explicit, subject to proof by direct or circumstantial evidence, testimonial or documentary. For example, the

38

type of evidence mentioned in *Kline* might not qualify as an explicit consent to shared parenting, but it would certainly be indicative of an intent to share. A birth mother's explicit testimony of her hope to share parenting with a partner could qualify as direct evidence of consent to share her parental rights to make decisions about care, custody, and control of a child. Likewise, the proof to support the notorious recognition demanded of a person in K.L.'s position can be direct or circumstantial, testimonial or documentary.

Further, as alluded to above, this case illustrates that proof of timing of an acknowledgment of maternity and a consent to share parenting is critical. The court must avoid giving either party a veto after the arrangement has been put in place and into effect at the time of the child's birth. Allowing unilateral action by either party to thwart the maternity of the other after a child has arrived and vital bonds with both have begun to form is unacceptable. On this question, we note that, under several of the KPA's presumptions, our Legislature has made the timing of the child's birth significant. See K.S.A. 2019 Supp. 23-2208(a)(1), (a)(2), (a)(3). These provisions support the idea that it is at the moment of birth when Kansas law deems a child to have either one parent or two.

Designating the time of the child's birth as *the* time when a birth mother must have consented to shared parenting and a woman in K.L.'s position must notoriously recognize maternity also makes sense for another, practical reason. Although the current statutory language means we emphatically stop short of requiring a formal contractual arrangement, a demand that each individual have made up her mind as of the time of the baby's arrival incentivizes stability for that child over surmountable relationship disappointments that are bound to occur. As with existence of premeditation when a trigger is pulled, the evidence of what is in the mind of the person pulling it may come from words and actions before, during, or after the event. See *State v. Smith-Parker*, 301 Kan. 132, 153, 340 P.3d 485 (2014) (listing factors used to evaluate circumstantial proof

39

of premeditation, including actions before, during, after killing). In the case of the birth of a child, the crystallization of the parties' individual intents at the time the child enters the world configures the family.

As a final note, to the extent the parties have asked us to consider independent arguments based on the merits of their equal protection and best interests arguments, we do not reach those issues today. It is unnecessary to do so for us to dispose of this case at this stage.

CONCLUSION

We have determined that the district judge erred as a matter of law by failing to apply the correct legal standards to the parentage case before him. The Court of Appeals did not correct the error. We therefore reverse the district court's judgment and the Court of Appeals panel's decision affirming it.

This case is remanded to the district court for further proceedings consistent with this opinion. On remand, the district judge will be free to allow submission of additional evidence by the parties if he deems such evidence necessary to conduct the legal analysis we have outlined. This evidence may extend to proof of the existence or nonexistence of competing presumptions.

HENRY W. GREEN, JR., J., assigned.[1]

STEVE LEBEN, J., assigned.[2]

* * *

STEGALL, J., dissenting: The lynchpin of the holdings in today's twin decisions in *In re M.F.*, 312 Kan. __ (No. 117,301, this day decided), and *In re W.L.*, 312 Kan. __ (No. 119,536, this day decided), is the majority's self-described "legal fiction" that a person can be a "biological parent" without sharing any parental DNA with the putative child. While this is certainly a fiction, it can hardly be described as a "legal" one. Indeed, under any accepted mode of statutory interpretation, the notion that the plain language of the Kansas Parentage Act means that a person not biologically related to a child can "become" a biological parent is untenable. I have demonstrated as much previously in *In re Adoption of T.M.M.H.*, 307 Kan. 902, 920-38, 416 P.3d 999 (2019) (Stegall, J., concurring and dissenting).

The majority rules that a person "may establish a legal fiction of biological parentage by asserting the Kansas Parentage Act (KPA) presumption of maternity in K.S.A. 2019 Supp. 23-2208(a)(4) by notoriously recognizing her maternity." 312 Kan.

---

[1]**REPORTER'S NOTE:** Judge Green, of the Kansas Court of Appeals, was appointed to hear case No. 117,301 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.

[2]**REPORTER'S NOTE:** Judge Leben, of the Kansas Court of Appeals, was appointed to hear case No. 117,301 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy of the court by the retirement of Chief Justice Lawton R. Nuss.

__, Syl. ¶ 1. As I explained in *T.M.M.H.*, the key to understanding the statutory scheme—and K.S.A. 2019 Supp. 23-2208(a)(4) in particular—is to understand the plain meaning of the words paternity, maternity, and recognize or acknowledge:

> "Paternity means something more specific than just generic fatherhood. As used in the KPA, it clearly means biological fatherhood. Paternity is the 'condition of being a father, esp. a biological one,' and maternity is the 'condition of being a mother, esp. a biological one.' Black's Law Dictionary 1125, 1306 (10th ed. 2014). An adoptive father does not take a paternity test to establish fatherhood—to do so would be both futile and nonsensical. Legal fatherhood is broader than mere paternity.

> "Furthermore, to acknowledge something means to recognize it 'as being factual.' Black's Law Dictionary 27 (10th ed. 2014). The act of acknowledgment [or recognition] does not make something true or real. To acknowledge something is merely to accept and recognize as true a preexisting reality. Thus, one cannot make oneself into a father by acknowledgment [or recognition]. A person who makes a voluntary acknowledgment of paternity is not akin to a person taking a citizenship oath—a noncitizen immediately beforehand and a citizen immediately afterward. Rather, a person acknowledging [or recognizing] paternity is a person who purportedly already is biologically related to a child and is merely availing himself of a presumption in favor of that preexisting condition. We explicitly made this point recently when we construed the meaning of '"acknowledgment of paternity"' to mean, citing Black's Law Dictionary, a '"father's public recognition of a child as his own."' *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 49, 392 P.3d 68 (2017). One can only publicly recognize a fact that preexists the act of recognition. Recognition does not give birth to the fact." 307 Kan. at 929 (Stegall, J., concurring and dissenting).

Contrary to this plain meaning, the majority fashions a statutory scheme under which a biological relationship can be conjured—*ex nihilo*—by the power of an incantation. The legal rule at work here is little more than "saying it makes it so." And that is no rule at all. The majority tries to rally statutory support for its legal fiction of

42

non-biological biology by pointing to the artificial insemination provisions of the KPA. The majority suggest that those provisions "work together to create complementary fictions: one that the husband of the woman undergoing the procedure is the actual biological father of the child produced, see K.S.A. 2019 Supp. 23-2302, and one that the sperm donor is not the actual biological father. See K.S.A. 2019 Supp. 23-2208(f)." Slip op. at 21.

But this, too, is incorrect. In fact,

"When parents in Kansas utilize ART in accordance with statutory guidelines, the nonbiological spouse who consents in writing to the procedure is automatically granted in law the rights and responsibilities of a parent-child relationship with the resulting child. That consent has the same effect 'as adoption papers.' K.S.A. 2016 Supp. 23-2303. And the child is given, by law, a status identical to 'a naturally conceived child of the [married couple].' K.S.A. 2016 Supp. 23-2302. Or as Professor Elrod put it in her amicus brief to this court in *Frazier*, the 'parent-child relationships resulting from ART are no different from those formed naturally or by adoption.' Presumably, though Kansas law speaks in terms of 'husband and wife,' the opportunity to avail themselves of a de facto adoption through ART is necessarily extended to same-sex married couples pursuant to the United States Supreme Court's ruling in *Obergefell v. Hodges*, 576 U.S. [644], 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015); see also *Marie v. Mosier*, 196 F. Supp. 3d 1202, 1221 (D. Kan. 2016) (relying on *Obergefell* to enjoin the executive branch of Kansas from 'treating same-sex married couples differently' than 'opposite-sex married couples' when determining 'the other rights, protections, obligations, or benefits of marriage')." 307 Kan. at 927-28 (Stegall, J., concurring and dissenting).

There is no fiction of biology created by the Assisted Reproductive Technology (ART) procedures. There is only a conferral of rights and responsibilities—of the legal status of parent and child. If anything, the ART provisions are merely an alternative form of adoption. This is why the KPA explicitly uses the legal rules governing adoptions to govern the consent required by the ART scheme. See K.S.A. 2019 Supp. 23-2303. It is

43

why courts can refer to the parent child relationship between the non-biological parent of a child produced by ART and the child as a "de facto adoption." *In re L.C.*, No. 120,072, 2020 WL 110866, at *6 (Kan. App. 2020) (unpublished opinion).

Once the majority has arrived at its "declared parentage" rule, the rest of the opinion is sheer policy making. How is this rule supposed to be applied? Certainly the statute doesn't tell us. What about the actual biological parents and what they want? What about the possibilities of fraud, or mere changes of whim? Does the magic that creates a biological parent out of nothing have to be set down in writing?

The majority recognizes these are vexing problems, and proceeds to do its best to provide workable answers. But of course solving these policy questions is not this court's job. See *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 562, 186 P.3d 183 (2008) ("It is not the duty of this court to criticize the legislature or to substitute its view on economic or social policy; it is the duty of this court to safeguard the constitution."). My fear is that in the process, we have continued down the dangerous road we set out on in *Frazier*. Just as in *T.M.M.H.*, I believe today's majority simply believes "that the responsibility to care for children can be shared with people who are neither biological nor adoptive parents and the law ought to find a way to recognize this when it is in the best interests of the child." *In re Adoption of T.M.M.H.*, 307 Kan. at 937 (Stegall, J., concurring and dissenting). Unfortunately, the legal scheme we have created now permits the commodification of children:

> "This … is nothing short of a revolution in societal norms that have for centuries firmly rejected the commodification of children. Here I must be clear—the *Frazier* court and today's plurality is saying that in Kansas, the prevailing law dictates that a parent in relation to a child possesses a discreet, property-like thing called a 'parental preference' which is divisible and can be 'contracted' away to a third party, thus conferring on that third party an equal parental preference which transmogrifies the third party into another

44

lawful parent of the child. What are the limiting principles governing these transactions? We do not know." 307 Kan. at 937 (Stegall, J., concurring and dissenting).

Today, we go even a step further and suggest that the third party's legal status as a parent can be brought into existence by the mere declaration of that third party, and such a declaration will be enforced even against a biological parent's rights by the mere showing of "implicit . . . proof by . . . circumstantial evidence . . . [of] an intent to share." Slip op. at 38-39. But children are not cookies, and sharing is far too elusive a concept on which to establish such bedrock relationships as those which exist between parents and their children.

> As I wrote in *T.M.M.H.*,

> "Long ago, Justice Brewer, writing for this court, articulated the fundamental manner in which the parent-child relationship is rooted in the 'law of nature.' *Chapsky v. Wood*, 26 Kan. 650, 652 (1881). As such, the positive law protects what we have come to call the 'parental preference' which is described as 'a fundamental right . . . to the care, custody and control of [the parent's] child.' . . . (quoting *Sheppard v. Sheppard*, 230 Kan. 146, 154, 630 P.2d 1121 [1981]). Justice Brewer recognized, however, that this parental preference 'is not like the right of property' which would render 'a child . . . like a horse or any other chattel, subject-matter for . . . gift or contract.' *Chapsky*, 26 Kan. at 652-53." 307 Kan. at 936 (Stegall, J., concurring and dissenting).

We have abandoned these sound principles at great risk to vulnerable children across our state.

As a final observation, I am struck by the fact that while I have made clear my disagreement with the majority's consistent interpretation of the KPA—in *Frazier*, *T.M.M.H.*, and in today's cases—the Legislature has said nothing. It is true that legislative silence is a weak indicator of correct judicial interpretations. *State v. Hambright*, 310

Kan. 408, 419, 447 P.3d 972 (2019) ("'Legislative inaction may not be the strongest indicator of specific legislative purpose, but it is *an* indicator [Citations omitted].'"). Nonetheless, legislative silence is a practical acquiescence if not a legal one. If the legislative branch does not agree with this court's interpretation of the KPA, it has a constitutional obligation to act. Otherwise, the carefully balanced separation of powers intended by our constitutional structure cannot properly function. *Sierra Club v. Mosier*, 305 Kan. 1090, Syl. ¶ 8, 391 P.3d 667 (2017) ("Under the separation of powers doctrine, determination of appropriate policy must be left to the legislative and executive branches of Kansas government, and courts are limited to the exercise of judicial power in interpreting and applying the law"); *Solomon v. State*, 303 Kan. 512, 545, 364 P.3d 536 (2015) (Stegall, J., concurring) ("when 'the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it'").

For these reasons, I dissent.