IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,536

In the Interest of F.C.,
a Minor Child.

SYLLABUS BY THE COURT

1.

If the language of a statute is not ambiguous, there is no need to resort to any canons of construction. Instead, the plain and unambiguous language of the statute, as written, governs its application.

2.

Under K.S.A. 2017 Supp. 38-2202(d)(2), a district court's adjudication decision on whether a child is one in need of care for lack of necessary care or control must be based on the circumstances existing on the date of the adjudication hearing, recognizing such circumstances may have been in existence for some time.

3.

Because K.S.A. 2017 Supp. 38-2202(d)(3) is phrased solely in the past tense—with a focus on whether the child "has been" abused or neglected—a district court may find a child to be in need of care if evidence of abuse or neglect of that child at any time is presented at the adjudication hearing.

Review of the judgment of the Court of Appeals in an unpublished opinion filed March 27, 2020. Appeal from Leavenworth District Court; GERALD R. KUCKELMAN, judge. Opinion filed March 19, 2021.

1

Judgment of the Court of Appeals reversing the district court is reversed, and the case is remanded with directions.

*Jeffrey Leiker,* of Overland Park, argued the cause and was on the briefs for appellant natural mother.

*Meredith D. Mazza*, assistant county attorney, argued the cause, and *Todd Thompson,* county attorney, was with her on the briefs for appellee.

The opinion of the court was delivered by

WILSON, J.: This is a child in need of care (CINC) case. In it, we interpret and apply K.S.A. 2017 Supp. 38-2202(d). This statutory subsection defines "[c]hild in need of care" for purposes of the Revised Kansas Code for Care of Children, K.S.A. 2017 Supp. 38-2201 et seq. These definitions both inform the court of the theories by which a child may be determined to be in need of care if the evidence so shows and instruct the court of the time at or during which that evidence must exist. The questions presented involve two parts of that statute: K.S.A. 2017 Supp. 38-2202(d)(2), which focuses on whether the child lacks necessary care or control, and K.S.A. 2017 Supp. 38-2202(d)(3), which focuses on whether the child has been abused or neglected.

FACTS AND PROCEDURAL BACKGROUND

In February of 2018, 13-year-old F.C. lived in Ft. Leavenworth, Kansas, with her mother, H.C. (Mother) and stepfather, R.C. (Stepfather), along with F.C.'s two younger siblings. F.C. had lived with Mother and Stepfather since she was a small child. Stepfather served as an officer in the U.S. Army.

That month, Payton Herken, a social worker at the Kansas Department for Children and Families (DCF), received a report about possible abuse of F.C. by Stepfather. The report worried Herken enough to contact F.C. the same day. After visiting with F.C., Herken called Mother. Herken also contacted the Army to inform it of her concerns about Stepfather. Later that day, Mother and Herken signed a family "safety plan" that included expectations of how the adults would modify some behaviors around the children and how discipline would be conducted. The plan would last a month. Within a day or two of Mother and Herken's visit, the entire family met to discuss the safety plan and Stepfather agreed to adjust his behavior.

About a week later, Herken followed up with F.C. and Mother. Herken learned the safety plan had not been followed faithfully. Herken was displeased and reminded Mother that the safety plan must be followed at all times. Herken's concern grew that Mother might not be willing to do what was needed to protect the children from Stepfather. Around this same time, the military asked Stepfather to leave the family home, which he did.

F.C. was given a child advocacy interview on March 13, 2018. A copy of the recording of this interview was admitted at the adjudication hearing, and the district court reviewed it. In it, F.C. described Stepfather's drinking problem, disciplinary habits, and the incidents during which she felt she had been touched inappropriately.

F.C. stated that Stepfather was "verbally abusive and emotionally because he really . . . tears me up inside, it feels like, and . . . makes me . . . want to run away and everything[.]" F.C. stated that when he would drink, "I didn't feel safe at all. I just wanted to run away and go somewhere . . . and stay at my friend's house because I did not want to be by him at all."

F.C. also described Stepfather's long term practice of routinely walking around the house in the nude, and his habit of coming into the bathroom—sometimes naked—while she was showering. The shower had only a see-through plastic sheet around it, so F.C. would turn around so that Stepfather could not see her. According to F.C., the clear shower curtains were Stepfather's idea: his stated reason was to ensure that the children were not "messing around" in the shower. Stepfather did not knock to announce his presence; rather, he simply entered the bathroom and stood close to F.C. Additionally, F.C. described Stepfather's comments in connection with the underwear she purchased, including his musing aloud as to why Mother could not wear similar underwear.

Following the interview, Herken again met with Mother on April 2, 2018, to discuss a second safety plan, but there was no agreement before Herken went to the office of the county attorney. On April 9, 2018, the State filed a petition under K.S.A. 38-2234, alleging F.C. to be a CINC. At the time the CINC petition was filed, Stepfather was still out of the home. F.C. was referred to KVC and was removed from the home.

The matter came before the district court for an adjudication hearing on December 4 and 13, 2018. When asked about whether her stepfather had ever been physically abusive, F.C. testified that she had been spanked with a belt, but that lately she was either grounded or had her phone taken away. She also described an incident from late December 2017.

F.C. was in trouble for fighting with her sister. To "cool [her] off," Stepfather made her stand on the snowy porch without a coat in her stocking feet. After about 5 to 10 minutes, Stepfather asked F.C. whether she wanted to come back inside. When she said "okay" instead of "yes, sir," she was ordered to do pushups. During the pushups, Stepfather pushed on her back and told her to go lower. Then Stepfather pushed her up

4

against a wall. When F.C. then told Stepfather she was "sick of the way he was treating me and my mom and my siblings," Stepfather told her to go upstairs. Then, after getting some tools, Stepfather went to F.C.'s bedroom and removed her bed, phone, and T.V., took the bedroom door off its hinges, and told F.C. she was not allowed to use electricity, including her bedroom lights. Her bed was replaced with a cot. After three days, the bedroom was placed back as it had been before the discipline was imposed.

Mother testified that she was "[n]ot really scared" of Stepfather when he drank, but she admitted that the children were scared of him. Mother further represented that the situation around the house had been improving since the family meeting, when Stepfather had stopped drinking, including during the approximately six weeks when F.C. was still at the house. Mother also opined that it would be safe for F.C. to return to the home.

Mother admitted that she "can see . . . now" how F.C. would be more uncomfortable with Stepfather's nudity now that F.C. was going through puberty. She noted that Stepfather's habit of walking around naked at home "was just something that he had done ever since I've known him." However, Mother also said that, after the family meeting, Stepfather no longer walked around naked. Mother "wasn't aware that [Stepfather] would stand there and look at [F.C.]" while F.C. was showering "for any longer than just saying . . . you need to get out of the shower, you know, hurry up[.]" Mother eventually put up "regular[,]" apparently opaque shower curtains in both bathrooms.

After the adjudication hearing, the district judge found F.C. to be a CINC under both statutory theories. In part, this conclusion was based on the district court's findings that F.C. was a credible witness, and that during their testimony both Mother and F.C. appeared to be afraid of Stepfather.

5

More specifically, the district court made the following findings and conclusions at the end of the adjudication hearing:

"I spent an hour, hour and a half, whatever it was watching that video, listening to [F.C.], and then I listened to her here today. . . . I believed [F.C.]. I found her testimony very compelling. . . .

". . . I just don't know very many people that would say it's okay to raise a child by running around nude in the house. Under the facts in this case, it didn't appear sexual, but for a 13-year-old girl to have to see her [stepfather] running around the house, and it sounded to me like it was on a regular basis, that it was just happening all the time, that isn't bad enough, but then he has to walk in on her in the shower. . . .

"I think when you add up all of the facts here, they do add up to emotional abuse. I think this child has been subjected to emotional abuse that a child should not be subjected to. The [stepfather's] drinking was out of control, and I know that being an alcoholic is not illegal; being an alcoholic does not cause somebody to be a child in need of care, but it sounds like he has anger control problems that are compounded by the drinking, and I think that that was very apparent in the testimony of both [F.C.] and her mother. I think both of these women are intimidated by him, and I've not met him, but he must be an intimidating guy because you can see the fear in their face when they talked about his drinking and how he acted.

6

"You get into the actual disciplining imposed, I frankly can't comprehend the whole deal about taking the door off the hinges, taking the bed away, not allowing her to use electricity. I think that the discipline is over the edge. I think it rises to the level of emotional abuse. I think that the mother is intimidated by the stepfather, and I don't think she was able to take the proper corrective measures until late in the game, and so I do think that there is clear and convincing evidence that [F.C.] is a child in need of care . . . ."

Mother appealed, and the Court of Appeals reversed the district court. The State then petitioned this court for review, which was granted on an expedited basis.

We will discuss additional facts more specifically below, where pertinent.

ANALYSIS

In order to determine whether the State proved F.C. was a CINC under either or both of its theories—that F.C. lacked sufficient care or control, pursuant to K.S.A. 2017 Supp. 38-2202(d)(2), and that F.C. was abused or neglected, pursuant to K.S.A. 2017 Supp. 38-2202(d)(3)—we first examine the applicable law. This requires interpretation of a statute.

K.S.A. 2017 Supp. 38-2202(d)(2)-(3) states as follows:

"As used in the revised Kansas code for care of children, unless the context otherwise indicates:

. . . .

7

"(d) 'Child in need of care' means a *person less than 18 years of age at the time of filing of the petition* or issuance of an ex parte protective custody order pursuant to K.S.A. 2017 Supp. 38-2242, and amendments thereto, *who*:

. . . .

(2) *is* without the care or control necessary for the child's physical, mental or emotional health;

(3) *has been* physically, mentally or emotionally abused or neglected or sexually abused[.]" (Emphasis added.)

Our court's review of a statute is de novo. *Dillon Real Estate Co. Inc. v. City of Topeka*, 284 Kan. 662, 665, 163 P.3d 298 (2007).

"All Kansas courts use the same starting point when interpreting statutes: The Legislature's intent controls. To divine that intent, courts examine the language of the provision and apply plain and unambiguous language as written. If the Legislature's intent is not clear from the language, a court may look to legislative history, background considerations, and canons of construction to help determine legislative intent." *Jarvis v. Kansas Dept. of Revenue,* 312 Kan. 156, 159, 473 P.3d 869 (2020).

Fundamentally, if the statute is not ambiguous, there is no need to resort to any canons of construction—including the general legislative purpose of the Revised Kansas Code for Care of Children (CINC Code) as set forth in K.S.A. 2017 Supp. 38-2201(b) (code should be liberally construed to promote child's welfare). Instead, the plain language of the statute controls.

With these rules in mind, we turn to consideration of the issues on review: (1) whether K.S.A. 2017 Supp. 38-2202(d)(2) limits the trial court's focus only to the present

8

circumstances at the time of the adjudication hearing; and (2) whether, in applying K.S.A. 2017 Supp. 38-2202(d)(3), the district court's findings of fact that F.C. had suffered emotional abuse were supported by clear and convincing evidence.

*K.S.A. 2017 Supp. 38-2202(d)(2) limits the trial court's focus only to the present circumstances at the time of the adjudication hearing.*

K.S.A. 2017 Supp. 38-2202(d)(2) defines a CINC as "a person less than 18 years of age at the time of filing of the petition or issuance of an ex parte protective custody order pursuant to K.S.A. 2017 Supp. 38-2242, and amendments thereto, who . . . is without the care or control necessary for the child's physical, mental or emotional health[.]" The State disagrees with the Court of Appeals that this portion of the statute requires the trial court to consider the sufficiency of the care or control as of the date of the adjudication hearing, claiming that such a temporal focus is too narrow.

The State begins by asserting that K.S.A. 2017 Supp. 38-2202(d)(2) is ambiguous, then pivots to a proposed interpretation that, it claims, is couched in the legislative intent behind the CINC Code generally, as set out in K.S.A. 2017 Supp. 38-2201: that the code should be liberally construed to promote the physical and mental health of children within its purview. Specifically, the State asserts that a court's only focus should be "on whether the claims as stated in the petition are proven by clear and convincing evidence" and that "the entire adjudication decision should not be based solely on evidence of the circumstances on the very date of the hearing." To the extent prior caselaw does not agree with the State, the State asks this court to determine such caselaw was simply wrong. Thus, for example, the State asks this court to overrule *In re D.H.*, 57 Kan. App. 2d 421, 429, 453 P.3d 870 (2019), *rev. denied* 311 Kan. 1046 (2020), which concludes that, "in determining whether a child is a CINC under K.S.A. 2019 Supp. 38-2202(d)(2), as here,

9

the district court should examine the child's circumstances existing on the date of the adjudication hearing." *In re F.C.,* No. 121,536, 2020 WL 1482411, at *6 (2020).

A close examination of K.S.A. 2017 Supp. 38-2202(d)(2) reveals, however, that the statute is not ambiguous. Without ambiguity, there is no need to resort to canons of construction—including the general legislative purpose set forth in K.S.A. 2017 Supp. 38-2201(b). See *Cent. Kansas Med. Ctr. v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018). While the initial clause in K.S.A. 2017 Supp. 38-2202(d) contains a temporal reference to the time of the petition, it pertains only to the *age* of the individual "at the time of the filing of the petition or issuance of an ex parte protective custody order[.]" After all, to be a child in need of care, one must be a child.

Each of the 14 specific categories of CINC that follow subsection (d) sets forth its own specific temporal scope of pertinent facts to establish whether a child is a child in need of care. For some of these subsections, things that occur after the petition is filed are irrelevant to whether the child has already been established under the code as one in need of care, including K.S.A. 2017 Supp. 38-2202(d)(3) ("has been physically, mentally or emotionally abused or neglected or sexually abused"), (d)(4) ("has been placed for care or adoption in violation of law"), and others.

But subsection (d)(2) is phrased differently. The plain language of this subsection is couched in the present tense. The scenario thus presented is one that is amenable to correction between the time of the filing of a CINC petition and the time of the adjudication hearing. A prosecutor who makes a good-faith determination that a child is "without the care or control necessary for the child's physical, mental or emotional health" is legally justified in filing a petition for those reasons. However, circumstances may change for the better by the time of the adjudication hearing such that this same

10

child "is" no longer without such care or control. The statute's dictate recognizes that such a positive turn of events should leave the care and control of the child in the hands of the parents (or legal guardians) without further government intervention.

*In re D.H.*—and the unpublished cases that precede it—largely agrees on this point. In *D.H.*, the district court found a child to be a CINC, under K.S.A. 2018 Supp. 38-2202(d)(2), *inter alia*, based on the suicide of the child's father and the child's alleged "abandonment" by her mother. In reversing that adjudication, the Court of Appeals panel thoughtfully considered the applicable "temporal scope" of several of the provisions of K.S.A. 2018 Supp. 38-2202(d), including subsection (d)(2):

> "Notably, however, there also are enumerated circumstances in the statutory CINC definition that use the present tense. Two of these circumstances were cited by the district court to support the CINC adjudication in this case: (1) a child who is without adequate parental care, control, or subsistence and (2) a child who is without the care or control necessary for the child's physical, mental, or emotional health. K.S.A. 2018 Supp. 38-2202(d)(1), (d)(2). Those grounds depend upon a view of the child's circumstances in the present. Although the 'present circumstances' may encompass circumstances existing on the date the petition was filed, the court's adjudication decision on whether a child is one in need of care should be based on the circumstances existing on the date of the adjudication hearing." *Interest of D.H.*, 57 Kan. App. 2d at 428-29.

We agree with this interpretation. Under subsection (d)(2), a trial court's adjudication decision on whether a child is one in need of care must be based on the circumstances existing on the date of the adjudication hearing.

The State further argues that the evidence of Stepfather's ostensible reformation does not establish that the problems underlying the insufficient "care or control necessary

11

for the child's physical, mental or emotional health" had been resolved. In furtherance of this alternative theory, the State suggests that remand to the district court is still appropriate for further fact-finding in accordance with our interpretation of (d)(2).

While we believe the Court of Appeals correctly interpreted K.S.A. 2017 Supp. 38-2202(d)(2), a majority of this court finds its application of that interpretation to the facts at bar more problematic. The trial court found that F.C. was a CINC for lack of care or control, largely because of Stepfather's behavior. However, the record reveals that the CINC petition was filed April 9, 2018—more than a month after Stepfather had moved out of the house. The State presented no adverse evidence about Stepfather's behavior that would have occurred after a family meeting that had taken place the previous February.

Ultimately, the Court of Appeals offered an assessment of the evidence and concluded as a matter of law that it did not rise to the level of establishing, by the required standard of proof of clear and convincing evidence, that F.C. was a CINC on the date of the adjudication hearing for lack of necessary care or control. A majority of this court believes the Court of Appeals forayed a bit too far into the realm of fact-finder in order to reach that conclusion. Instead, the matter should have been remanded to the district court for it to consider the appropriate temporal scope of evidence relevant to its inquiry under subsection (d)(2), as we have now clarified it. We cannot speculate further as to what the district court's ultimate determination would have been under this remand order, particularly given the evidence as to the timing of Stepfather's departure from the home and F.C.'s court-ordered removal.

In this case, however, our resolution of the second issue makes such remand unnecessary, as will be discussed below.

12

The State also asserts that, if the evidence under K.S.A. 2017 Supp. 38-2202(d)(2) must be viewed as of the date of the adjudication hearing, then the State would be forced continually to amend its petition in order to comply with K.S.A. 2017 Supp. 38-2234, leading to delays in the discovery process. While the State is correct that the combined effect of K.S.A. 2017 Supp. 38-2234(a)(1)(E) and K.S.A. 2017 Supp. 38-2234(a)(2) requires a CINC petition to contain "specific facts . . . relied upon to support" "the basis for the petition," nothing suggests that *ongoing* factual circumstances need to be updated continually in a CINC petition. Thus, the State's argument is not persuasive.

*In applying the evidence to K.S.A. 2017 Supp. 38-2202(d)(3), the district court's findings of fact that F.C. had suffered emotional abuse were supported by clear and convincing evidence.*

The district judge adjudicated F.C. as a CINC pursuant to K.S.A. 2017 Supp. 38-2202(d)(3) due to emotional abuse. The Court of Appeals panel held there was insufficient evidence to support the district court's conclusions of emotional abuse. The State argues that the district court's specific findings that F.C. was a CINC based on emotional abuse by Stepfather were supported by clear and convincing evidence. Mother continues to challenge the sufficiency of the evidence supporting that finding.

> "[W]hen an appellate court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

13

In evaluating the sufficiency of the evidence, "the appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. at 705.

Unlike K.S.A. 2017 Supp. 38-2202(d)(2), K.S.A. 2017 Supp. 38-2202(d)(3) is phrased solely in the past tense. The focus is on whether the child "has been" abused or neglected. Thus, evidence of abuse or neglect at any time may be considered by the court in determining whether the State has met its burden to prove the elements of a cause of action filed pursuant to this portion of the statute. See, e.g., *In re C.B.,* No. 121,873, 2020 WL 1814467, at *5 (Kan. App. 2020) (unpublished opinion), *rev. denied* Aug. 26, 2020 (sexual abuse that ended five years earlier sufficient to support a CINC adjudication under [d][3]).

Kansas appellate courts have upheld CINC adjudications based on emotional abuse when, for instance, a child has been exposed to domestic violence in the home. See, *e.g.*, *In re A.H.*, 50 Kan. App. 2d 945, 950, 334 P.3d 339 (2014). However, other panels have stressed the need for "specific evidence of a psychological injury or likely injury related to [a parent's] treatment of" a child. *In re J.W.*, No. 112,668, 2015 WL 8590309, at *8 (Kan. App. 2015) (unpublished opinion) (minimizing importance of child's "feelings" as indicative of emotional abuse).

A plain reading of K.S.A. 2017 Supp. 38-2202(d)(3) reveals a definition for a child in need of care that is quite broad in its scope. First, there is no time limitation set forth in the definition. Second, "abuse" is defined broadly in K.S.A. 2017 Supp. 38-2202(y) as "the infliction of physical, mental or emotional harm *or* the causing of a deterioration of a child and may include, *but shall not be limited to*, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is

14

endangered." (Emphasis added.) (It is further defined to include sexual abuse, as set forth in subsection [gg], though that is not at issue in this case.) Additionally, "harm" is defined in K.S.A. 2017 Supp. 38-2202(l) to mean "physical or psychological injury or damage."

The Court of Appeals panel held there was insufficient evidence that Mother or Stepfather inflicted emotional harm on F.C. and found the State had failed as a matter of law to establish that F.C. had been emotionally abused under subsection (d)(3). 2020 WL 1482411, at *9.

When viewing all the evidence in a light most favorable to the State, as we are required to do, we find the Court of Appeals has given too little deference to the trial court's findings of fact. This deference extends not only to just what the witnesses said, but also goes to the trial court's findings concerning credibility and demeanor of those witnesses. In this case, these findings are supported by at least the following evidence:

- Stepfather having frequent bouts of anger, during which he would yell and, in at least one instance, even throw things at the children;

- Stepfather's frequent, sometimes daily, drinking of liquor, which exacerbated his negative attitudes and behaviors;

- Stepfather's habit of walking around the house naked;

- Mother's reluctance to confront Stepfather about his nudity, even after F.C. told Mother it made her very uncomfortable;

15

- A house rule that prohibited locking doors, including the bathroom door, so that anyone could—and did—walk in on F.C. while she was showering;

- Another house rule that required transparent shower curtains, which, at times, made it near impossible for F.C. to prevent her sometimes naked stepfather from seeing her own naked body while she showered;

- F.C.'s reluctance to tell Stepfather that his "visits" in the bathroom during her showers made her uncomfortable because he might have a "problem with it";

- Stepfather's disciplinary practices that included:

  - Once forcing F.C. to stand in the snow for approximately five minutes without a coat and wearing only socks on her feet;

  - Once removing F.C.'s bed, taking her bedroom door off the hinges, taking F.C.'s phone and TV, and telling F.C. she could not use any electricity, such as turning on her bedroom light, all of which occurred after F.C. angrily told Stepfather that she hated the way he treated Mother and her siblings;

  - Forcing F.C. and the other children to do pushups if they failed to say "yes, sir" or otherwise be sufficiently respectful to Stepfather; and

  - Sometimes shaking the children awake in the middle of the night to do mundane chores, like washing dishes;

16

- The district court's finding that F.C. was a credible and reliable witness;

- F.C.'s statement that Stepfather was "verbally abusive and emotionally because he really . . . tears me up inside, it feels like, and . . . makes me . . . want to run away and everything";

- F.C.'s description of Stepfather's "anger issues that just came natural. . . . [E]ven though he wasn't drinking, he still . . . always had . . . a negative attitude. . . . I never wanted to be around him because he was just so mean";

- F.C.'s testimony that she did not feel safe around Stepfather;

- The fear observed by the district court in the faces of Mother and F.C. when they described Stepfather's anger and drinking issues.

In the end, a majority of this court agrees there is sufficient clear and convincing evidence to show that F.C. had been subjected to emotional abuse by Stepfather as that term is defined under the admittedly broad parameters of K.S.A. 2017 Supp. 38-2202(d)(3). We are not convinced that the issues presented in this case were simply a matter of discipline, as Mother suggests.

We understand and appreciate the dissent's concern that the breadth of the abuse or neglect contemplated by the statutory provisions of K.S.A. 2017 Supp. 38-2202(d)(3) may lead to excessive governmental intrusion into the rights of a parent to discipline children as he sees fit. We acknowledge that the behaviors cited in the present case are not as clear cut as other instances of emotional abuse might be, but we nonetheless

17

believe that the district court's conclusion is supported by clear and convincing evidence. We defer to the district court for its findings of fact precisely for reasons demonstrated in this case. Only the trial judge can ascertain fear or intimidation based on such things as the ferocity of a gaze, a sudden change of expression, or the tone of a voice. While the "cold record" may cause an appellate judge pause, there is sufficient evidence to support this trial judge's conclusions when he said, "I think both of these women are intimidated by [the defendant], and I've not met him, but he must be an intimidating guy because you can see the fear in their face when they talked about his drinking and how he acted."

Additionally, a majority of this court does not share the dissent's perspective that the district court, in finding that Stepfather emotionally abused F.C., somehow filled a statutory void with its own values. Instead, as we have discussed, the district court was entitled to rely on its observations of F.C. and Mother, as part of the evidence presented before it, to conclude that the cumulative effect of Stepfather's conduct overall constituted emotional abuse. This is no revolutionary holding conferring any grant of vast new powers to the State, as the dissent claims; it is, on the contrary, nothing more and nothing less than the role of an appellate court to grant deference to a district court's findings of fact, where supported by the appropriate standard of evidence.

On this second issue, we reverse the judgment of the Court of Appeals and affirm the district court's adjudication decision. In light of this determination, we believe remand for additional adjudication findings pursuant to our resolution of the first issue to be unnecessary. Consequently, we remand the matter to the district court so that it may conduct further post-adjudication proceedings pursuant to the Revised Kansas Code for Care of Children.

18

BEIER, J., not participating.

MICHAEL E. WARD, Senior Judge, assigned.[1]

\* \* \*

LUCKERT, C.J., concurring:  I join my colleagues in unanimous agreement regarding the majority's interpretation of K.S.A. 2017 Supp. 38-2202(d). But I disagree with a portion of the majority's reasoning. Some of Stepfather's behavior that the majority lists as evidence of abuse constitutes no more than strict discipline or unorthodox and—using the dissent's label—"icky" actions. And, while I agree with much of the dissent's indictment of K.S.A. 2017 Supp. 38-2202(d)(3) and concede that its breadth could lead to excessive governmental intrusion into the rights of a parent to discipline children, I disagree that this is such a case.

Determination of this outcome rests on the following findings of the district court judge. The judge found F.C. "credible," characterizing her testimony as "very compelling." The judge also found that F.C. had faced "emotional abuse" arising from Stepfather's "out of control" drinking and "anger control problems that are compounded by drinking." I cannot dismiss these findings as easily as does the dissent because the judge further found that F.C. and Mother "are intimidated by [Stepfather] . . . because you can see the fear in their face when they talked about his drinking and how he acted." I credit the judge who saw these witnesses and who assessed the effect of Stepfather's

_____

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 121,536 vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.

19

behavior on them, especially on F.C. Fear founded in longstanding and repeated emotional abuse during episodes of out-of-control drinking is more than just being "uncomfortable." It can and, in the assessment of the district judge, did here reach a level warranting the government's intervention. Appellate courts should not reweigh that assessment.

I agree with the majority's decision to affirm the district court's conclusion that F.C. was a child in need of care.

\* \* \*

STEGALL, J., dissenting: I agree with the court's interpretation of the statutes in question. But I cannot join the majority's determination that the State met its burden to establish by clear and convincing evidence that F.C. suffered "emotional abuse" under K.S.A. 2019 Supp. 38-2202(y).

There is no evidentiary dispute in this case. This is not an example of a higher court showing or failing to show deference to a lower court's fact-findings. It is not even a case of appellate judges inappropriately reweighing the evidence. Rather, this case illustrates a different problem—that what evidence "counts" to support a vague legal standard is entirely dependent on the particular judge's subjective biases, personal life experiences, norm and taboo matrices, and socio-economic expectations. And the legal standard of "emotional abuse" has now been effectively stripped of any objective content by today's decision.

As the majority recites, the district court funneled its application of the law to the facts through the court's own personal matrix of norms and taboos, biases, and experiences, ruling:

> "I just don't know very many people that would say it's okay to raise a child by running around nude in the house. Under the facts in this case, it didn't appear sexual, but for a 13-year-old girl to have to see her [stepfather] running around the house, and it sounded to me like it was on a regular basis, that it was just happening all the time, that isn't bad enough, but then he has to walk in on her in the shower. . . .
>
> "I think when you add up all of the facts here, they do add up to emotional abuse. I think this child has been subjected to emotional abuse that a child should not be subjected to. . . .
>
> "You get into the actual disciplining imposed, I frankly can't comprehend the whole deal about taking the door off the hinges, taking the bed away, not allowing her to use electricity. I think that the discipline is over the edge. I think it rises to the level of emotional abuse."

The Court of Appeals, however, while properly expressing approbation of Stepfather's behavior, tried to hold the State to a more objective standard for proving "emotional abuse." The three-judge panel unanimously concluded that the evidence of "emotional abuse" was insufficient, beginning with a recitation of the evidence:

> "The district court determined that F.C. suffered emotional abuse based on: Stepfather's 'running around nude'; Stepfather's 'walking in on' F.C. while she was in the shower; F.C. 'walking in on' Stepfather while he was masturbating; and Stepfather's 'over the edge' discipline of taking the door off the hinges, removing her bed, and not letting F.C. use electricity. Mother argues that these acts do not show emotional abuse.

21

. . . .

"The State argues that although F.C. used the word 'uncomfortable,' it requires little inference to believe that a 13-year-old girl would suffer 'emotional harm' from these situations." *In re F.C.*, No. 121,536, 2020 WL 1482411, at *8-9 (Kan. App. 2020) (unpublished opinion).

The Court of Appeals then carefully considered the more objective criteria listed in the statute:

"Although the State's speculation may be reasonable, it fails to constitute clear and convincing evidence of emotional abuse. 'Physical, mental or emotional abuse' means the infliction of physical, mental or emotional harm or the causing of a deterioration of a child and may include, but shall not be limited to, maltreatment or exploiting a child to the extent that the child's health or emotional well-being is endangered.' K.S.A. 2019 Supp. 38-2202(y). Harm is defined as 'physical or psychological injury or damage.' K.S.A. 2019 Supp. 38-2202(l). Based on the plain language of these statutes, to support a finding of emotional abuse the State must present evidence that Mother or Stepfather inflicted emotional harm on F.C.—psychological injury or damage—or caused her deterioration.

"Although a psychological evaluation is not necessary, some evidence must show that Mother and/or Stepfather inflicted emotional harm on F.C. See, e.g., *In re A.H.*, 50 Kan. App. 2d 945, 948, 951, 334 P.3d 339 (2014) (finding emotional abuse when a child witnessed domestic violence between mother and father and then began to exhibit violent behavior towards mother); *In Interest of A.M.D.*, No. 117,320, 2017 WL 3001352, at *2-3 (Kan. App. 2017) (unpublished opinion) (finding a teacher's description of the child's appearance as crying and distraught was fully consistent with a finding of emotional harm—the child was visibly upset)." 2020 WL 1482411, at *9.

Finally, the Court of Appeals weighed the evidence against these standards and found it wanting:

"The only evidence that F.C. suffered psychological injury, damage, or deterioration was her statement that Stepfather's actions made her feel 'uncomfortable.' But neither F.C. nor any other witness testified to her crying, being upset, or having any other emotional reaction to Stepfather's acts. . . . The record thus lacks specific evidence that F.C. suffered psychological injury, damage, or deterioration because of Stepfather's acts.

"And Stepfather's acts, although unusual and concerning, are not severe or persistent enough for us to find that they necessarily inflicted emotional harm on F.C. Although F.C. saw Stepfather masturbating one time, he was in his bedroom and the evidence fails to show he knew F.C. was home or that he intentionally left his door open. Stepfather's taking F.C.'s door off the hinges, removing her bed, and not letting F.C. use electricity were acts of discipline which, although severe, were short-term and did not deprive F.C. of essentials. Stepfather's nudity was not suggested to be for the purpose of sexual arousal but was evidently a longstanding habit he believed was healthy; nonetheless, he stopped when he realized it made F.C. uncomfortable. Similarly, the evidence shows that the family practice was to permit other family members to enter the bathroom when one was showering. Stepfather apparently did so without making F.C. uncomfortable when she was younger. And the evidence fails to show that Stepfather continued to enter the bathroom when F.C. was showering after the family meeting in February.

"Even viewing the record in the light most favorable to the State, we find a lack of clear and convincing evidence that F.C. was emotionally abused." 2020 WL 1482411, at *9-10.

23

But now, the majority is simply more convinced by the subjective "ick" factor which swayed the district court than by the workmanlike application of the more objective evidentiary approach taken by the Court of Appeals. To be clear, the majority has held, as a matter of law, that the following facts are evidence of emotional abuse sufficient to justify the State removing a child from his or her parents:

- A parent's "habit of walking around the house naked" even when there is zero evidence of sexual abuse;
- A parent's "rule that prohibited locking doors, including the bathroom door";
- Transparent shower curtains; and
- Disciplinary practices including taking a bedroom door off its hinges and doing pushups.

And to buttress these admitted facts, the majority and concurring opinions make much of the lower court's factual finding that Stepfather "must be an intimidating guy"—even though the judge admitted he had "not met him"—simply because the judge discerned "fear in [F.C.'s and Mother's] face[s]." See slip op. at 6, 17. But this "finding" is not the kind of ordinary credibility determination we permit judges observing facial expressions and body language to make. A factual finding concerning Stepfather's characteristics has nothing to do with F.C.'s credibility and is supported here by nothing more than a judge's interpretation of a witness' facial expression.

The very language used by the judge all but concedes the judge was speculating. We know this because he prefaces his finding with the speculative modal being verb "must be." Such modal being verbs (including "may be," "might be," "can't be," and

24

"must be") are used as syntax to indicate a guess about a fact based on incomplete information. Common examples in everyday English usage are phrases like "you must be joking," "he must be crazy," or "there must be some mistake." See Luu, *The Hidden Life of Modal Verbs*, JSTOR Daily, (November 14, 2018), https://daily.jstor.org/the-hidden-life-of-modal-verbs/ ("Modals are weird verbs, syntactically defective in that they don't inflect like regular verbs, and their very presence essentially messes up simple, direct statements by introducing very confused human feelings of uncertainty, possibility, obligation, permission, and ability into the mix. . . . Not only do modals make declaratives sound less sure of themselves, they are also often semantically ambiguous . . . . For example: . . . how are we to understand an utterance like 'you must try some of this delicious cake!' which pretends to be a requirement but isn't really."). Without some actual testimony or the judge's observations of Stepfather, a witness' facial expression is insufficient to support a factual finding that Stepfather was "an intimidating guy" who was emotionally abusing F.C.

In the past, I have made clear my legal objections to this court's practice of inventing new ways to create a parent-child relationship. See *In re M.F.*, 312 Kan. 322, 353, 475 P.3d 642 (2020) (Stegall, J., dissenting); *In re W.L.*, 312 Kan. 367, 385, 475 P.3d 338 (2020) (Stegall, J., dissenting). I am equally loath to grant the State the chilling and vast new powers created by today's decision to interfere with and potentially terminate the parent-child relationship. What would happen—to pick a controversial example—if a child complained of being "uncomfortable" that her father performed as a drag queen? What if that child was later adjudicated a victim of "emotional abuse" after a district court judge concludes that: "[I]t didn't appear sexual, but for a 13-year-old girl to have to see her [father]" doing that, "[not] very many people . . . would say it's okay to raise a child" in that environment. Is there a legal standard in today's decision that would permit a court to distinguish that case from this one?

25

Indeed, as explained at the outset, the reality of subjective judicial decisions driven by the biases of judges is a perennial problem in this area of the law. And that bias is nearly always exercised on behalf of the upwardly mobile, middle-class, bourgeois, and polite society from which the majority of judges come, and in which most judges continue to live. When judges are forced to choose between competing values, "there '*will* be a systematic bias . . . in favor of the values of the upper middle, professional class from which most lawyers and judges . . . are drawn.'" *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 775, 440 P.3d 461 (2019) (Stegall, J., dissenting) (quoting Ely, *Foreword: On Discovering Fundamental Values*, 92 Harv. L. Rev. 5, 37 [1978]).

The literature discussing this problem is robust. For example, while noting the disadvantages faced by rural parents, some commentators have observed that "the state sometimes removes children because their parents lack outward signs of a middle-class lifestyle. Judges and caseworkers, for example, often impose middle-class values and expectations on impoverished families, who may not 'fit dominant cultural paradigms, such as white, married, middle-class, and suburban.'" Wallace & Pruitt, *Judging Parents, Judging Place: Poverty, Rurality, and Termination of Parental Rights*, 77 Mo. L. Rev. 95, 95-96, 116 (2012). Because "society does not view poor families as 'real' families" it tends to "devalue[] these 'other' families to the point of tolerating the termination of the parent-child relationship. Parents whom the law tends to regard as less worthy include the impoverished, the divorced, racial/ethnic minorities, and/or sexual minorities. . . . [R]ural families are also among these disfavored and devalued populations." 77 Mo. L. Rev. at 116.

Judicial bias exists on behalf of—and against—all manner of parent demographics and parenting choices. See, e.g., Baer, *The Amplification of Bias in Family Law and Its*

*Impact*, 32 J. Am. Acad. Matrim. Law. 305, 335 (2020); Levison, *Resolving Divisive Social Issues: A Case Study of the Minnesota Child Custody Dialogue*, 42 Mitchell Hamline L. Rev. 1682, 1685-86 (2016) (analyzing perceived anti-father bias in custody and termination proceedings); Moss, *McGriff v. McGriff: Consideration of a Parent's Sexual Orientation in Child Custody Disputes*, 41 Idaho L. Rev. 593, 613 (2005) ("[J]udges' individual values can shape their decisions even within a framework that seeks to minimize such influence."); Ellis, *The Washington State Parenting Act in the Courts: Reconciling Discretion and Justice in Parenting Plan Disputes*, 69 Wash. L. Rev. 679, 721 (1994) (discussing alleged judicial bias in determining whether a mother's "instability" will affect her parenting capabilities).

Numerous studies have suggested that racial and sexual minorities are especially vulnerable to these judicial biases. See, e.g., Kennedy, *Children, Parents & the State: The Construction of a New Family Ideology*, 26 Berkeley J. Gender L. & Just. 78, 79 (2011) ("Family law and policy are rooted in an ideology that privileges one familial ideal but excludes and marginalizes the many other forms that families take. A belief in the superiority of raising children in a family of two heterosexual married individuals continues to inform a wide array of laws and policies, and these socio-legal norms adversely impact poor families, families of color, single-parent families, and gay and lesbian parents."); Perry, *Race Matters: Change, Choice, and Family at the Millennium*, 33 Fam. L.Q. 461, 473 (1999) ("For many Black families, however, state intervention seems to have become the norm rather than the exception. Disproportionate numbers of Black children are under the supervision of child welfare authorities and disproportionate numbers have been removed from their homes and placed in foster care."); Roberts, *Child Welfare and Civil Rights*, 2003 U. Ill. L. Rev. 171, 173 (2003) ("The new politics of child welfare threatens to intensify state supervision of black children. In the last several years, federal and state policy has shifted away from preserving families toward 'freeing'

children in foster care for adoption by terminating parental rights."); Karst, *Poverty and Rights: A Pre-Millennial Triptych*, 16 Notre Dame J.L. Ethics & Pub. Pol'y 399, 402 (2002) ("But if we change the setting only slightly, it becomes plain that poverty itself can be a severe burden on a parent's constitutional right to preserve the parent-child relationship.").

In my view, the emergence of these biases is not because the judges hearing these cases are intentionally prejudiced. Instead, it is because a lack of clearly defined, objective legal standards leaves a vacuum that judges must fill with *something*. In the absence of such rigorous and testable measuring sticks, judges will fall back on what often flies under the banner of "common sense"—that is, a judge's life experience, norm and taboo matrices, and socio-economic expectations about what constitutes a healthy and abuse-free childhood.

We have discussed the dangers of vague legal rules before. Recently, we held that vague laws "fail[] to provide adequate enforcement guidelines" and therefore it is "left up to [public officials] to give the law teeth through their enforcement decisions and actions." *State v. Harris*, 311 Kan. 816, 823, 467 P.3d 504 (2020). As Justice Robert Jackson once wrote, without clear legal standards to guide us, we human beings "usually end up . . . condemning all that we personally disapprove and for no better reason than that we disapprove it." *Jordan v. De George*, 341 U.S. 223, 242, 71 S. Ct. 703, 95 L. Ed. 886 (1951) (Jackson, J., dissenting).

The recent societal debate over "free-range parenting" provides a concrete, real-world example of this phenomenon in action. "[P]arenting standards . . . have shifted dramatically in recent years, favoring overprotection and constant supervision over the imagination, exploration, and independence parents [instilled] in their children for

generations. . . . Because many believe that helicopter parenting is the only proper parenting style, the trend has effectively become 'mandatory in many communities.'" Manno, *How Dramatic Shifts in Perceptions of Parenting Have Exposed Families, Free-Range or Otherwise, to State Intervention: A Common Law Tort Approach to Redefining Child Neglect*, 65 Am. U. L. Rev. 675, 677-78 (2016).

Due to the vagueness of most state child neglect and abuse laws, the social worker's, prosecutor's, or judge's perception of whether a parent's decision to allow a child to play by himself or herself at a park, for example, may be determinative of the future of that parent-child relationship. "[C]urrent parenting standards in the United States emphasize overprotecting children instead of traditional notions of parenting that allowed children more freedom and independence. The shift to overprotection has permeated legal standards governing child abuse and neglect and has led to discrimination against parents of wide-ranging backgrounds." 65 Am. U. L. Rev. at 678.

Legal observers have noted that in "the absence of clearer statutory directives, the interpretation and enforcement of vague standards will almost inevitably be driven by culture-specific norms of parenting." Pimentel, *Criminal Child Neglect and the "Free Range Kid": Is Overprotective Parenting the New Standard of Care?* 2012 Utah L. Rev. 947, 976 (2012). Professor Pimentel gives numerous examples in his seminal article on this issue.

> "One example is the issue of teaching a child to work. Some cultures, including nineteenth century American agrarian society, would insist that a child's development requires that the child learn to discipline herself to work hard, including, perhaps, to share in the responsibility for supporting the family. Other cultures would condemn those very same conditions as child labor, a violation of the fundamental rights of the child.

29

"The fact that child neglect standards are necessarily culture specific should raise two concerns. The first is that ethnic and socio-economic minorities in the United States are likely to come out losers in child neglect proceedings, as they may be parenting according to a different set of cultural values. Indeed, the woman in Montana who left her kids at the mall grew up in Puerto Rico as one of eight children. Large families in the Latino community are far more likely to expect older children to take responsibility for younger children. This may go a long way toward explaining why she saw nothing irresponsible about trusting her twelve-year-old to care for younger siblings and why both the prosecutor (who apparently had one daughter) and the mock juror with one child were the least sympathetic and least forgiving of her actions that day." 2012 Utah L. Rev. at 976-78.

It is not difficult to imagine the mischief possible in a world where state power is exercised on such vague and standardless grounds. Consider the literature arguing that same-sex parenting creates a measurable "harm" to the child. See, e.g., Regnerus, *How Different Are the Adult Children of Parents Who Have Same-sex Relationships? Findings from the New Family Structures Study*, 41 Social Science Research 752 (2012); Sullins, *Emotional Problems among Children with Same-sex Parents: Difference by Definition*, 7 British Journal of Education, Society & Behavioural Science 99 (2015).

Of course such harsh judgments of others' parenting choices are not limited to those who oppose same-sex parenting. Indeed, perhaps the most dangerous forms of social meddling come in more "enlightened" packages with revered institutional stamps of approval. For example, Elizabeth Bartholet, Harvard Law School's Wasserstein public interest professor of law and faculty director of the Law School's Child Advocacy Program, has recently argued for a presumptive ban on homeschooling, on the grounds that it deprives children of their natural rights and creates a cocoon of abuse. See Bartholet, *Homeschooling: Parental Rights Absolutism vs. Child Rights to Education &*

*Protection*, 62 Ariz. L. Rev. 1, 3, 57 (2020). Bartholet's description of homeschooling could certainly qualify as "abuse" under the standards enunciated by today's decision.

More broadly, some have gone so far as to suggest that merely giving a child a traditional religious upbringing is child abuse. See Cooper, *Forcing a Religion on your children is as bad as child abuse, claims atheist professor Richard Dawkins*, The Daily Mail (April 22, 2013), https://www.dailymail.co.uk/news/article-2312813/Richard-Dawkins-Forcing-religion-children-child-abuse-claims-atheist-professor.html (reporting Oxford Fellow Emeritus Richard Dawkins' claim that: "What a child should never be taught is that you are a Catholic or Muslim child, therefore that is what you believe. That's child abuse.").

Consider two hypothetical Kansas social workers—with very different views of how children ought to be raised. One has read and accepted the work of Mark Regnerus and Paul Sullins. The other admires and agrees with the work of Elizabeth Bartholet and Richard Dawkins. Given that it is axiomatic that 13-year-olds the world over are—to varying degrees—"uncomfortable" with their parents, what in today's decision would stop these social workers from declaring a child of a same-sex couple or a child of a traditional Catholic family to be children in need of care on the grounds of "emotional" abuse?

The point is not that my colleagues in the Kansas judiciary are about to start removing such kids from their loving and caring families. Rather, the point is that I am unable to discern any objective standard set forth by the majority by which such cases could be decided. This leaves all decision makers within the system—from the front line social workers to the ultimate arbiters in court—in the no-win situation of being cast back

on the subjective standard of "condemning all that [they] personally disapprove." *Jordan*, 341 U.S. at 242 (Jackson, J., dissenting).

For these reasons, I dissent.

WALL, J., joins the foregoing dissent.